No. 14-1439

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

*Paula Szyjka, et al.*

**Appellants**

*v.*

*Peter Vandermeer, et al.*

**Appellees**

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

**Opening Brief of Appellants**

_____

**JAMES O'C GENTRY
EMILY C. MALARKEY
SALSBURY, CLEMENTS, BEKMAN,
   MARDER & ADKINS, LLC**
**300 W. Pratt Street, Suite 450
Baltimore, MD. 21201
(410) 539-6633**
*Attorneys for Appellants*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iv

Jurisdictional Statement .......................................................... 1

Issues Presented For Review .................................................... 1

Statement of the Case ............................................................. 2

Statement of the Facts ............................................................ 2

Summary of the Argument ..................................................... 12

Argument ................................................................................ 13

    I.    STANDARD OF REVIEW ................................................ 13

    II.    THE TRIAL COURT ERRED IN PRECLUDING DR. LANDOLFI, PLAINTIFFS' ONLY "BLIND REVIEWER," FROM TESTIFYING ABOUT THE STANDARD OF CARE APPLICABLE TO DR. VANDERMEER ....... 14

        A.    Guiding Legal Principles ......................................... 15

            1.    *Federal Rule of Evidence 702* ....................... 15

            2.    *Maryland Law* ............................................... 17

            3.    *Which Law Applies?* ...................................... 18

        B.    Dr. Landolfi Was Qualified Under Federal And Maryland Law To Testify About The Standard Applicable To Any Physician Trained To Interpret MRIs Of The Brain ........ 20

            1.    *Rule 702* ....................................................... 23

            2.    *Maryland Law* ............................................... 23

C.    The Court Did Not Offer A Satisfactory Explanation For Finding That Dr. Landolfi Was Not Qualified ................. 25

D.    Dr. Landolfi Had An Adequate "Foundation" For His Opinions ................................................................ 28

E.    Dr. Landolfi's Exclusion Cost The Szyjkas A Fair Trial .. 30

III.    THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD NOT EVALUATE DR. VANDERMEER'S CARE IN "PERFECT HINDSIGHT" ................................................................ 33

A.    The Court Of Appeals Has Never Approved A "Retrospect" or "Perfect Hindsight" Instruction ...................................... 34

B.    The Instruction As Given Was Confusing, Misleading, And Blessed Dr. Vandermeer's Defense With Judicial Imprimatur ................................................................ 35

Conclusion ................................................................ 40

Request for Oral Argument ................................................ 41

Certificate of Compliance ................................................ 42

Certificate of Service ................................................ 43

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248 (4th Cir. 2005) ..... 13

*Bryte ex rel. Bryte v. American Household, Inc.,* 429 F.3d 469 (4th Cir. 2005) ... 19

*Buck v. Henry,* 25 A.3d 240 (N.J. 2011) ................................................................ 26

*Cavallo v. Star Enterprise,* 100 F.3d 1150 (4th Cir. 1996) ................................... 19

*Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001) ........................... 13

*Creekmore v. Maryview Hosp.,* 662 F.3d 686 (4th Cir. 2011) .............................. 19

*Daniel v. Pearce,* No. 99-1405, 213 F.3d 630 (4th Cir. Apr. 28, 2000) ................ 19

*DeMuth v. Strong,* 45 A.3d 898 (Md. Ct. Spec. App. 2012) ..................... 17, 18, 23

*Dickenson v. Cardiac and Thoracic Surg. of East. Tenn.,* 388 F.3d 976 (6th Cir. 2004) ........................................................................................................................ 16

*Ellis v. K-Lan Co.,* 695 F.2d 157 (5th Cir. 1983) .................................................. 30

*Friendship Heights Associates v. Vlastimil Koubek, A.I.A.,* 785 F.2d 1154 (4th Cir. 1986) ................................................................................................... 16, 30

*Garrett v. Desa Industries,* 705 F.2d 721 (4th Cir. 1983) ..................................... 16

*Gonzales v. Smith,* No. L-9284-10, 2012 WL 603216 (N.J. Super. Ct. App. Div. Feb. 27, 2012) ........................................................................................................ 26

*Green v. State*, 736 A.2d 450 (Md. Ct. Spec. App. 1999) ...................................... 34

*Hetrick v. Weimer*, 67 Md. App. 522 (Md. Ct. Spec. App. 1986) .......................... 34

*Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777 (3d Cir. 1995) ......................... 15, 16

*Hottle v. Beech Aircraft Corp.,* 47 F.3d 106 (4th Cir. 1995) ................................. 18

*Jones v. Bagalkotakar,* 750 F. Supp. 2d 574 (D. Md. 2010) ........................... 18, 23

*Kennelly v. Burgess,* 654 A.2d 1335 (Md. 1995) .............................................. 35, 36

*Kopf v. Skyrn,* 993 F.2d 374 (4th Cir. 1993) .................................................... 15, 23

*Legg v. Chopra,* 286 F.3d 286 (6th Cir. 2002) ........................................................ 20

*Liesback v. United States,* 731 F.3d 850 (9th Cir. 2013) ......................................... 20

*Minger v. State,* 849 A.2d 1058 (Md. Ct. Spec. App. 2004) ................................... 34

*Nance v. Gordon,* 62 A.3d 185 (Md. Ct. Spec. App. 2013) ............................. 18, 23

*Noel v. Artson,* 641 F.3d 580 (4th Cir. 2011) ......................................................... 14

*Pages-Ramirez v. Ramirez-Gonzalez,* 605 F.3d 109 (1st Cir. 2010) .................... 17

*Pringle v. Rapaport,* 980 A.2d 159 (Pa. Super. Ct. 2009) ....................................... 38

*Schneider v. Fried,* 320 F.3d 396 (3d Cir. 2003) .................................................... 17

*Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052 (4th Cir. 1986) ....................... 19, 20

*Stutzman v. CRST, Inc.,* 997 F.2d 291 (11th Cir. 1993) ......................................... 20

*Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791 (4th Cir. 1989) ................. 16

*United States v. Barile,* 286 F.3d 749 (4th Cir. 2002) ............................................ 14

*United States v. Kivanc,* 714 F.3d 782 (4th Cir. 2013) ........................................... 14

*United States v. Mouzone,* 687 F.3d 207 (4th Cir. 2012) ....................................... 14

*United States v. Stitt,* 250 F.3d 878 (4th Cir. 2001) ............................................... 14

*Volvo v. Trademark Holding Aktiebolaget v. Clark Machinery Co.,* 510 F.3d 474, (4th Cir. 2007) ......................................................................................................... 14

*Weimer v. Hetrick,* 309 Md. 536 (Md. 1987) ........................................................ 34

*Yates v. University of West Virginia Board of Trustees,* 549 S.E.2d 681 (W.Va. 2001) .................................................................................................................. 37

## Statutes and Rules

Fed. R. Evid. 702 ................................................................................... 15, 23

Md. Code, Cts. & Jud. Pro. § 3-2A-02(c)(2)(ii). ................................ 5, 6, 17, 23

Md. Rule 16-812, MRPC 7.4 .......................................................................... 27

N.J. Admin. Code § 10:54-4.20 ..................................................................... 26

N.J. Stat. Ann. § 2A:53A-41 ......................................................................... 26

## Other

Black's Law Dictionary (9th ed. 2009) ........................................................... 29

MPJI-Civil 27:1 ............................................................................................... 35

## JURISDICTIONAL STATEMENT

This appeal is taken from judgment entered on a jury verdict in favor of Appellees. Jurisdiction in the District Court existed under 28 U.S.C. § 1332 given the parties' diversity of citizenship. On May 1, 2014, Appellants noted a timely appeal from that Court's entry of final judgment, which disposed of all of Appellants' claims. This Court accordingly has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

I.   **DID THE TRIAL COURT ERR WHEN IT RULED THAT PLAINTIFFS' EXPERT NEURO-ONCOLOGIST, WHO HAS EXTENSIVE EXPERIENCE INTERPRETING MRI OF THE BRAIN, AND WHO WAS THE ONLY WITNESS FOR THE PLAINTIFFS TO HAVE CONDUCTED A "BLIND REVIEW" OF MR. SZYJKA'S MRI, COULD NOT TESTIFY ABOUT THE STANDARD OF CARE?**

II.  **DID THE TRIAL COURT ERR IN GIVING THE JURY A "PERFECT HINDSIGHT" INSTRUCTION, WHICH WAS CONFUSING, MISLEADING, AND WHICH BLESSED THE DEFENSE THEORY WITH JUDICIAL IMPRIMATUR?**

## STATEMENT OF THE CASE

This is an action for medical negligence brought under the court's diversity jurisdiction. Appellants, Roman and Paula Szyjka, sued Peter Vandermeer, M.D., a radiologist, alleging that he failed to diagnose and report an abnormality on an MRI taken of Roman Szyjka's brain in January of 2008, causing Mr. Szyjka to suffer permanent brain injury and the inability to properly walk, talk, and eat. The Szyjkas also sued Advanced Radiology, P.A. and Baltimore Washington Medical Center as the actual and apparent principals of Dr. Vandermeer.

The case was tried before a jury for ten days, from March 31 through April 11, 2014. The jury found in favor of Dr. Vandermeer. This appeal followed.

## STATEMENT OF THE FACTS

### The Underlying Facts

On January 10, 2008, Roman Szyjka was taken by ambulance to the Baltimore Washington Medical Center, in the Baltimore suburbs, due to complaints of dizziness, lightheadedness and feeling off-balance during a routine employment physical.[1] In the emergency room, the decision was made to admit him to the hospital overnight for testing, including an MRI of the brain.

The MRI was performed the following morning, January 11, 2008, and was interpreted by Peter Vandermeer, M.D., a radiologist with special training in

---

[1] All facts set forth in this section can be found in the Complaint. [17-24].

neuroradiology.[2] Dr. Vandermeer interpreted the MRI of the brain as essentially normal, and Mr. Syzjka was discharged with a diagnosis of "vertigo" later that day.

About eighteen months later, in July of 2009, Mr. Szyjka started to experience humming in his left ear and headaches in the back of his head. An MRI of the auditory canals performed in August diagnosed an abnormality in the prepontine area of the brain, just in front of the brain stem. The radiologist who interpreted that MRI suspected the lesion might be a meningioma, a tumor that arises from the membranes surrounding the brain and spinal cord.

Mr. Szyjka was referred to Alberto Quinones, M.D., a neurosurgeon at Johns Hopkins Hospital. Dr. Quinones advised Mr. Szyjka that his best course of treatment would be open brain surgery (craniotomy) to resect the tumor. Dr. Quinones's colleagues, who also evaluated Mr. Szyjka, agreed that he was not a candidate for less-invasive therapies, including Gamma Knife radiosurgery, a highly-specialized surgical radiation procedure that uses cobalt beams targeted to the precise location of the tumor. Mr. Szyjka consented to the craniotomy, and the tumor was removed during a marathon nine-and-a-half hour-long surgery on November 13, 2009. Pathology confirmed that it was a WHO Grade I meningioma, which is non-cancerous.

---

[2] Neuroradiology focuses on radiographic studies of the brain and spine. A neuroradiologist is a radiologist with special training in neuroradiology.

Although the tumor was not cancer, Mr. Szyjka developed serious complications stemming from the invasive brain surgery. Despite months of inpatient treatment followed by years of physical, occupational, speech, and swallowing therapy, Mr. Szyjka was left with a significant and permanent brain injury that affects his ability to walk, talk, eat, and speak. He suffers from facial palsy, eats only liquid-based food by way of a tube that has been surgically placed in his stomach (with limited pureed solids by mouth), speaks with a pronounced impediment, and has suffered from personality changes that have dramatically affected his relationships. He had to retire early from his job as an engineer for Northrum Grumman. He will need assistance with his activities of daily living for the rest of his life.

## Trial

In September of 2012, the Szyjkas filed a lawsuit against Dr. Vandermeer; his employer, Advanced Radiology, P.A.; and Baltimore Washington Medical Center as his apparent principal. The suit asserted that earlier recognition of his tumor by Dr. Vandermeer would have allowed Mr. Szyjka to be successfully treated with Gamma Knife radiosurgery, thereby avoiding the invasive open brain surgery from which all of his permanent deficits flowed. [17-24].

*Plaintiffs' Experts*

Trial began on March 31, 2014. Richard Latchaw, M.D., a neuroradiologist and Professor of Radiology at University of California-Davis, testified that Dr. Vandermeer was negligent in failing to recognize and report an abnormality visible on the January 2008 MRI, and in failing to recommend a follow-up study.

The second expert for the Szyjkas was Joseph Landolfi, D.O., a board-certified neurologist and fellowship-trained neuro-oncologist who specializes in performing Gamma Knife surgery on brain tumors.[3] The Szyjkas had intended to call Dr. Landolfi to testify that Dr. Vandermeer breached the standard of care applicable to physicians trained to read brain MRI by failing to observe the abnormality on Mr. Szyjka's January 2008 MRI. This expectation was based on the trial court's ruling, at an all-day pre-trial motions hearing, that Dr. Landolfi (and Plaintiffs' neurosurgeon, Stephen Bloomfield, M.D.) was qualified to give standard of care testimony against Dr. Vandermeer, both under the Federal Rules of Evidence and under a Maryland statute requiring that experts who testify in malpractice cases be board-certified and have clinical experience in a field of medicine that is the same or "related" to the defendant's. *See* MD. CODE, CTS. &

---

[3] A D.O. is a Doctor of Osteopathy, which is a 4-year degree comparable to a Doctor of Medicine (M.D.) degree, but based on a different philosophy and approach to patient care. Osteopathic doctors compete for, and participate in, the same residency and fellowship programs as M.D.s, and take the same board certification examinations. *See* *http://www.osteopathic.org/osteopathic-health/about-dos/what-is-a-do/Pages/default.aspx* (last checked October 21, 2014).

JUD. PRO. § 3-2A-02(c)(2)(ii). [60-81; 83]. The court based its ruling on Dr. Landolfi and Bloomfield's extensive experience interpreting MRIs of the brain, and rejected Dr. Vandermeer's argument that the standard of care applicable to them was different from that which applied to him. [76-78].

Unlike Dr. Latchaw (Plaintiffs' radiologist), Dr. Landolfi had performed a "blind review" of Mr. Szyjka's MRI. In other words, he first interpreted the MRI without any knowledge that the film was the subject of litigation, and without any knowledge of the patient's outcome. In fact, he believed that the MRI belonged to a patient of a colleague. He testified that he was "walking down the hallway" from his office when Dr. Bloomfield (another expert for the Szyjkas) "stopped me and asked if I would look at an MRI scan." [210]. Because this was a "common occurrence" that they "often ask each other" to do, Dr. Landolfi agreed. *Id.; see also* [211-212]. He entered Dr. Bloomfield's office and saw that a single MRI image was on his computer screen. *Id.* He asked Dr. Bloomfield to tell him information about the patient, but Dr. Bloomfield declined and "said he just wanted me to look at the film and tell me what I think." *Id.* Dr. Landolfi agreed:

> I did so. I noticed a funny area of concern. I wasn't sure what it was. I asked him if – if the area enhanced, that means when they give an injection on an MRI scan, pathological processes as well as blood vessels can light up. He said it did.
> I asked then to see a coronal image with contrast, and **then it was obvious that there was an abnormality**

> **<u>there, something that shouldn't have been there</u>**, at which point he told me the story.
>
> He then asked if[,] my recollection is[,] if he talked to you, Mr. Gentry, if I talk to the lawyer involved in the case, would you be willing to get involved?
>
> To which quite frankly my response was I'd rather not get involved. I don't really like to be involved in legal cases.
>
> But in light of the fact that it was clearly an abnormality there, that I would consider it, and I said it would be fine for you to contact me. [210-211; *see also* 212].

Despite the trial court's pre-trial ruling, when Dr. Landolfi took the witness stand at trial, the court inexplicably reversed its decision and precluded Dr. Landolfi from giving standard of care testimony, finding that he was not qualified to do so. [153-160; 178-209]. Although the court allowed Dr. Landolfi to explain the circumstances of his blind review, it limited his opinion testimony to the issue of causation, *i.e.,* that had the tumor been diagnosed in 2008, Gamma Knife radiosurgery would have been performed and would have cured Mr. Szyjka. *Id.*

The final liability expert for the Szyjkas was Steven Bloomfield, M.D., a neurosurgeon. Like Dr. Latchaw (the radiologist), Dr. Bloomfield also had <u>not</u> performed a "blind review," and Plaintiffs therefore had made a strategic decision before trial to call him only on the issue of causation.[4] [158; 194]. Because of the court's about face regarding Dr. Landolfi, however, the Szyjkas were compelled to

---

[4] The court was aware of this decision and knew that it was important to Plaintiffs to call Dr. Landolfi on the standard of care instead of Dr. Bloomfield. [192].

call Dr. Bloomfield as a standard of care expert. Directly at odds with its ruling regarding Dr. Landolfi, the court *permitted* Dr. Bloomfield to offer standard of care testimony, even though he too was not a radiologist. [265-274].

*The Defense*

The central theory of Dr. Vandermeer's defense was that the entire case was manufactured by the Szyjkas' lawyers and their "hired gun" "actor" experts to "make money." [500-01; 512]. Dr. Vandermeer argued that Drs. Latchaw and Bloomfield had not performed a "blind review" of the MRI, but rather, came to their opinions because they were told by Plaintiffs' counsel that Dr. Vandermeer missed the tumor, and were paid to give an opinion that he was negligent. [499-512]. He urged the jury to reject their testimony as fundamentally unfair because it was encumbered by an incurable "hindsight bias," and argued that the manner in which they had reviewed the case was "absolutely wrong under Maryland law." *Id.*

In his defense and in support of this theory, Dr. Vandermeer called two neuroradiologists whom he claimed reviewed the MRI "blindly" and "prospectively." These experts, Frank Berkowitz, M.D. and James Abrahams, M.D., testified that they were contacted by a paralegal at a law firm and asked to read and write a report on an MRI that was the subject of litigation. [343-57; 361-72]. They testified that they were not told what party the law firm represented, or any clinical information about the patient or his outcome besides what Dr.

8

Vandermeer knew when he read the MRI. *Id.* Only after receiving a CD containing the 2008 film and writing a report were they contacted by Dr. Vandermeer's lawyer, provided additional information about Mr. Szyjka, and asked if they were willing to testify in his defense. *Id.* They agreed and so testified.

*Jury Instructions And Verdict*

At the conclusion of the trial, and in furtherance of his defense that the opinions of Plaintiffs' standard of care experts should be rejected because they were offered in "hindsight," Dr. Vandermeer requested that the jury be instructed that it "may not use 'hindsight' to evaluate the situation as it confronted Dr. Vandermeer, nor should [it] judge Dr. Vandermeer by any after-acquired knowledge." [549]. The court declined to give that instruction and found that "there's no foundation for it." [451]. Instead, and over Plaintiffs' objection, the Court opted to give a "perfect hindsight" instruction:

> A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively.
> If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the doctor is not liable for malpractice. [451-55; 563].

The court also granted a defense motion to forbid the Szyjkas from arguing that the fact that Dr. Landolfi could see the abnormality (in his blinded review) was evidence that Dr. Vandermeer should have too. [385-92; 433-47]. As part of its

decision, the court crafted and gave a jury instruction precluding the jury from

considering Dr. Landolfi's testimony as evidence on the issue of standard of care,

and instructing it <u>only</u> to consider Drs. Latchaw and Bloomfield's testimony in

deciding whether Dr. Vandermeer was negligent:

> With respect to the expert testimony offered in this case, there are four experts who have been qualified by the Court to give their opinions as to the standard of care rendered by Dr. Vandermeer on January 11, 2008.
>
> Those four experts are Dr. James Abrahams and Dr. Frank Berkowitz, both neuroradiologists presented by the defense, and Dr. Richard Latchaw, a neuroradiologist and Dr. Steven Bloomfield, a neurosurgeon, presented by the plaintiffs.
>
> There are other experts who have been qualified in other fields but have not been qualified to offer their opinions with respect to the standard of care to be exercised by a radiologist on January 11, 2008. [560-61; *see also* 442-48].

Armed with these two instructions, defense counsel argued in closing that

the Szyjkas' standard of care experts were "basically actors," "hired to say lines"

[501] because they reviewed the case knowing the clinical outcome, and therefore

their testimony constituted illegal "hindsight:"

> Maryland law prohibits using hindsight to evaluate Dr. Vandermeer's interpretation. They did it with both of them, because that's how you get a good result.
>
> They [Plaintiffs' experts] looked at this case inconsistent with the standard of care in Maryland. [500].
>
> ….
>
> That's exactly what Maryland law says, to not do that. That is a hindsight interpretation of the study. You know what the outcome is. [506].

> ….
> What do you get when you use hired gun veteran plaintiffs' witnesses when you use a biased unfair procedure to review an imaging study? What do you get?
> Clearly abnormal. Obviously abnormal. Clear miss.
> When you set it up to find an abnormality, when you stack the deck, there's no surprise about this. Maryland law says this is absolutely wrong, and it is not fair. [512-13].
> ….
> Why is a fair review important? Because Maryland law says it is. [516].
> ….
> [W]hen you get the verdict sheet and it indicates do you find that Dr. Vandermeer – do you find plaintiffs have established that Dr. Vandermeer met the standard or violated the standard of care, the answer is no.
> You could even put a different kind of question there in your mind's eye. Do you find that the plaintiffs' review process to come to that conclusion was fair? There's no way that review process was fair. [521-22].

The jury retired for deliberations for approximately four and a half hours,

after which it sent a note to the Clerk with the following question:

> If a doctor makes a decision that proves to be incorrect, does that breach the standard of care?  [575; 727].

In response to this question, over Plaintiffs' objection, the court re-read the

"perfect hindsight" instruction it had previously given.[5] [575-81].

---

[5] Paper copies of the complete set of jury instructions also were given to all nine jurors who deliberated. [555].

11

Within 30 minutes, the jury returned with a defense verdict.[6] [582; 726; 729].

## SUMMARY OF THE ARGUMENT

The trial court erred when it reversed its pre-trial ruling and decided to preclude Joseph Landolfi, a board-certified neurologist and fellowship-trained neuro-oncologist, from testifying that Dr. Vandermeer, a fellowship-trained neuroradiologist, was negligent in his interpretation of Mr. Szyjka's brain MRI. The record established that Dr. Landolfi was trained and experienced in the interpretation of brain MRI, that doing so was part of his daily medical practice, and that he even teaches residents how to read them. This experience is all that is required under both the Federal Rules of Evidence and Maryland law to qualify him to testify about Dr. Vandermeer's negligence.

This error cost the Szyjkas a fair trial. In a case where the central defense was that the negligence was fabricated by "hired gun" experts who had performed an unfair, illegal, "hindsight" review, Dr. Landolfi – who had performed the "blindest" review possible, doing so in the course of his routine medical practice without knowing that the MRI was the subject of litigation, the outcome of the case, or even any clinical information about Mr. Szyjka whatsoever – was the

---

[6] The jury retired to deliberate at 10:20 a.m. [574]. The jury's notes show that the first note was submitted at 2:43 p.m. and the verdict was reached at 3:45 p.m. [727-28]. A large portion of this hour was spent gathering counsel to the courtroom, arguing the proper response to the question, and re-instructing the jury.

Plaintiffs' most persuasive evidence, and best chance to adequately respond to this attack. The trial court's preclusion of his testimony was compounded by its decision to forbid counsel from arguing that Dr. Landolfi's interpretation was evidence that Dr. Vandermeer breached the standard of care, and to forbid the jury from considering it as such.

The court additionally erred in instructing the jury that the law does not permit Dr. Vandermeer's conduct to be "viewed" "retrospectively," or to "see" it "in perfect hindsight." This instruction – which is not sanctioned by the Maryland Court of Appeals or the Maryland Pattern Jury Instructions – was confusing, misleading, and placed undue emphasis on Dr. Vandermeer's theory of the case. It was tantamount to a judicial endorsement of Dr. Vandermeer's defense, and directly affected the verdict.

Reversal is required to correct these errors and ensure the Szyjkas a fair trial.

## ARGUMENT

### I.   STANDARD OF REVIEW

The decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *See Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir. 2001). If the trial court makes an error of law in deciding whether to admit or preclude expert testimony, that error is "by definition an abuse of discretion." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 260 (4th Cir. 2005);

*see also United States v. Barile,* 286 F.3d 749, 753 (4th Cir. 2002); *United States v. Stitt*, 250 F.3d 878, 896 (4th Cir. 2001).

A review of the propriety of jury instructions should be undertaken "holistically." *Noel v. Artson,* 641 F.3d 580, 586 (4th Cir. 2011). This Court should determine "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.*; *see also United States v. Kivanc,* 714 F.3d 782, 794 (4th Cir. 2013). The Court should determine *de novo* whether the instructions correctly state the law. *See Volvo v. Trademark Holding Aktiebolaget v. Clark Machinery Co.,* 510 F.3d 474, 484 (4th Cir. 2007); *United States v. Mouzone,* 687 F.3d 207, 217 (4th Cir. 2012).

## II. THE TRIAL COURT ERRED IN PRECLUDING DR. LANDOLFI, PLAINTIFFS' ONLY "BLIND REVIEWER," FROM TESTIFYING ABOUT THE STANDARD OF CARE APPLICABLE TO DR. VANDERMEER

The trial court committed reversible error when it determined that Dr. Landolfi, a board-certified, fellowship-trained neuro-oncologist with special training and expertise in the performance of Gamma Knife radiosurgery, was not qualified to give opinions on the standard of care for interpreting MRIs of the brain. Dr. Landolfi testified that he has been reading brain MRI for over 20 years, that he personally interprets multiple MRIs of the brain every day, and that he teaches others to do so. This experience is all that is required under both Federal

Rule of Evidence 702 and Maryland law to establish that he was qualified to render opinions on the standard of care applicable to Dr. Vandermeer. The preclusion of his testimony deprived the Szyjkas of the opportunity to present their own "blind review" to the jury in an effort to counter Dr. Vandermeer's "hindsight" defense. It deprived them of a fair trial, and should be reversed.

## A.    Guiding Legal Principles

### 1.    *Federal Rule of Evidence 702*

"The Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact," and Rule 702, governing expert witness testimony, "specifically embraces this policy." *Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 780 (3d Cir. 1995) (quotation marks and citation omitted). That Rule, which "has a liberal policy of admissibility," *see id.* at 781*,* sets forth several requirements for expert testimony, only one of which – the expert's qualifications – is at issue here. The text of the Rule and cases interpreting it have made it clear that an expert can be qualified in one of five ways: either by virtue of his or her knowledge, skill, experience, training, **or** education. *See* FED. R. EVID. 702; *Kopf v. Skyrn,* 993 F.2d 374, 377 (4th Cir. 1993).

A court must "liberally judge" an expert's qualifications, and

> the test for exclusion is a strict one, and the purported
> expert must have neither satisfactory knowledge, skill,

15

> experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Id.* (Quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir. 1989)). "Most arguments about an expert's qualifications relate more to the weight to be given to the expert's testimony than to its admissibility," and therefore, a witness may be qualified to testify even if the court does not believe he or she is the "best" person to do so. *Holbrook,* 80 F.3d at 782 ("Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.")

Indeed, this Court and others have held that it is reversible error to exclude a witness because he lacks one of the five qualifications set forth in Rule 702. *See Garrett v. Desa Industries,* 705 F.2d 721 (4th Cir. 1983); *Friendship Heights Associates v. Vlastimil Koubek, A.I.A.,* 785 F.2d 1154, 1159-60 (4th Cir. 1986) ("the fact that he lacked experience with the particular item at issue did not preclude his testifying as an expert"); *Holbrook,* 80 F.3d at 782-78 (reversing preclusion of physician expert in an asbestos case because he was not a pulmonologist or oncologist). In medical negligence cases, other circuits have reversed decisions to preclude physicians from testifying on the grounds that they did not practice in the same specialty as the defendant. *See Dickenson v. Cardiac and Thoracic Surg. of East. Tenn.,* 388 F.3d 976 (6th Cir. 2004) (abuse of discretion to preclude cardiac surgeon from testifying against pulmonologist

regarding extubation procedure); *Pages-Ramirez v. Ramirez-Gonzalez,* 605 F.3d 109 (1st Cir. 2010) (abuse of discretion to preclude neonatologist from testifying against obstetrician regarding delivery of brain injured baby); *Schneider v. Fried,* 320 F.3d 396 (3d Cir. 2003) (abuse of discretion to preclude cardiologist from testifying against interventional cardiologist because the expert did not actually perform interventional cardiology procedures).

### 2.   *Maryland Law*

Maryland law imposes more stringent requirements on the qualifications of experts who are permitted to testify in medical malpractice cases. With certain exceptions not relevant here, Section 3-2A-02(c)(2)(ii) of the Courts and Judicial Proceedings Article (CJP) requires that any expert who testifies on the applicable standard of care be board-certified, and have clinical experience or teach, in either the same or a "related" specialty as the defendant. Recent case law interpreting the meaning of the word "related" has held that it "embraces fields of health care and board certification specialties that, in the context of the treatment or procedure in a given case, overlap." *DeMuth v. Strong,* 45 A.3d 898, 911 (Md. Ct. Spec. App. 2012). The inquiry is case-specific and the court must look at the conduct being challenged in the lawsuit before determining whether the expert has the appropriate experience to testify about it.

Applying this test, the Maryland Court of Special Appeals and the U.S. District Court for the District of Maryland have held that a vascular surgeon could testify about the standard of care applicable to an orthopedic surgeon regarding post-operative complications following knee replacement, *see id.*; that a nephrologist could testify about the standard of care applicable to a urologist regarding the evaluation of a patient with blood in his urine, *see Nance v. Gordon,* 62 A.3d 185 (Md. Ct. Spec. App. 2013); and that a pediatrician could testify against an emergency room doctor regarding the evaluation of a child in the emergency room. *See Jones v. Bagalkotakar,* 750 F. Supp. 2d 574 (D. Md. 2010).

### 3.    *Which Law Applies?*

The question of whether F.R.E. 702 or CJP § 3-2A-02(c)(2)(ii) governs the admissibility of standard of care testimony in a malpractice case appears to be an open one in this Circuit.[7] On the one hand, this Court has commented that "there are circumstances in which a question of admissibility of evidence is so intertwined with a state substantive rule that the state rule … will be followed in order to give full effect to the state's substantive policy." *Hottle v. Beech Aircraft Corp.,* 47 F.3d 106, 110 (4th Cir. 1995) (holding that Virginia rule precluding admission of a party's internal rules and regulations to show negligence applies in

---

[7] Dr. Vandermeer's pre-trial motion to limit Dr. Landolfi's testimony cited only the Federal Rule. [26-32]. In rendering its decision, the District Court applied both. [77].

a federal diversity case). On the other hand, this Court appears to have firmly held

that the admissibility of *expert testimony* is a matter reserved for Rule 702 alone:

> Unlike evidentiary rules concerning burdens of proof or presumptions, the admissibility of expert testimony in federal court sitting in the diversity jurisdiction is controlled by federal law. **State law, whatever it may be, is irrelevant.**

*Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1054 (4th Cir. 1986) (holding that

Virginia law rejecting "human factors" expert testimony does not apply in diversity

action) (emphasis added). *See also Cavallo v. Star Enterprise,* 100 F.3d 1150, 1157

(4th Cir. 1996); *Bryte ex rel. Bryte v. American Household, Inc.,* 429 F.3d 469,

475-76 (4th Cir. 2005).

       This Court has twice before faced the precise issue of whether state statutes

imposing requirements on experts who testify in malpractice actions are applicable

in federal diversity trials. Both times, it has declined to answer the question

because, under the facts before it, the expert was qualified regardless of what law

applied. *See Daniel v. Pearce,* No. 99-1405, 213 F.3d 630 at n. 4 (4th Cir. Apr. 28,

2000); *Creekmore v. Maryview Hosp.,* 662 F.3d 686 (4th Cir. 2011).

       While the Szyjkas assert that this Court should abide by its holding in *Scott*

and apply only F.R.E. 702 to determine whether Dr. Landolfi was qualified to give

standard of care testimony, ultimately, reversal is required even if CJP § 3-2A-

19

02(c)(2)(ii) applies.[8] Dr. Landolfi has the requisite knowledge, training and

experience to qualify under F.R.E. 702, **and** he is board-certified in a "related"

field of medicine under Maryland law.

> **B.** **Dr. Landolfi Was Qualified Under Federal And Maryland Law To Testify About The Standard Applicable To Any Physician Trained To Interpret MRIs Of The Brain**

Joseph Landolfi graduated from the University of Medicine and Dentistry of

New Jersey (now part of Rutgers University) in 1992.[9] [140; 54]. After medical

---

[8] The Sixth Circuit has held that state statutes imposing requirements on experts in malpractice cases apply in federal diversity cases, citing F.R.E. 601's mandate that witness competency is to be determined by state law in cases where "state law supplies the rule of decision." *See Legg v. Chopra,* 286 F.3d 286 (6th Cir. 2002) (holding that Tennessee statute requiring expert to practice in Tennessee or a "contiguous" state applied in a federal diversity action). The Ninth Circuit has adopted this holding. *See Liesback v. United States,* 731 F.3d 850 (9th Cir. 2013) (holding that Alaska statute requiring expert be board certified in a field "directly related" to the care at issue applied in an action brought under the Federal Tort Claims Act).

Should this Court reach the question, Appellants urge it to affirm its holding in *Scott* and reject the reasoning of the Sixth Circuit in *Legg.* Plaintiffs submit that the proper reasoning is that of the Eleventh Circuit in *Stutzman v. CRST, Inc.,* 997 F.2d 291 (11th Cir. 1993), in which the court held that state law setting forth requirements on expert testimony were not *competency* rules, but rather, were rules of *admissibility* that "regulate process rather than establish substantive rights," because they govern "what evidence may be used to prove the essential elements of a claim." *Id.* at 295. This reasoning makes sense and comports with this Court's holding in *Scott.* If state laws regarding malpractice expert witness qualifications apply in diversity actions, such a rule would completely eviscerate F.R.E. 702 and *Daubert*'s mandate regarding qualifications necessary to testify in federal cases.

[9] The trial judge made a negative comment about this school, asking if Plaintiffs' next expert graduated from it or from a "regular medical school." The

school, he pursued an internship in internal medicine and a three-year residency in neurology, followed by a two-year fellowship in neuro-oncology at Memorial Sloan Kettering Cancer Center in New York City. [142-43; 53-54]. Upon completion of his fellowship in 1998, he became Board-certified in Neurology and joined the Neuroscience Institute of JFK Medical Center, a tertiary care center in Edison, New Jersey, where he began practicing as a neuro-oncologist treating patients with abnormalities of the central nervous system.[10] *Id.*

In 2002, Dr. Landolfi began training with a German expert in the performance of Gamma Knife radiosurgery, a procedure to treat brain tumors using radiation that was developed in Germany. [144]. Dr. Landolfi began performing Gamma Knife surgery as the Director of the JFK Gamma Knife program later that year. *Id.* The following year, he became the Director of Neuro-oncology and the chair of the JFK Brain Tumor Board, a multidisciplinary team of physicians who treat patients with brain tumors. [146; 53]. Thereafter he became the Chair of the Department of Neurology. [148; 53]. In 2006, he started working (in addition to

---

University of Medicine and Dentistry of New Jersey *is* a "regular" medical school. It previously was Seton Hall University's medical school until, in 1965 it was acquired as part of the New Jersey state system and renamed. In 2013 it, along with all other New Jersey state medical and health sciences schools, was incorporated into the Rutgers system.

[10] There is no separate Board certification for neuro-oncology.

JFK Medical Center) at the Jersey Shore University Medical Center, becoming Medical Director of the Neuro-oncology Department. [149; 54].

Dr. Landolfi has published numerous scholarly articles in professional medical journals including *Neurology*, the *Journal of Neuro-oncology*, *Neuro-oncology*, and the *European Journal of Cancer*. [150; 54-59]. He has been featured on CBS news, local New Jersey news media outlets, and in 2012 was named Physician of the Year by NJ Biz magazine. [150-51; 59].

Dr. Landolfi began reading MRIs of the brain and spine when was a medical intern. [146-47]. On average, he reads five MRIs of the brain every day, with an additional five on Mondays when he presides over the JFK Tumor Board (whose other members include a neuroradiologist). [146; 176-77]. He reads brain MRIs "all the time, every day, on the beach, at my home," and estimated that, over the course of his 15 years of practice since his fellowship, had performed over 1,000 Gamma Knife surgeries, all of which involve brain MRI. [144; 147; 177]. He teaches neurology residents to read MRI and CT of the brain. [176-77]. He always interprets his patients' MRIs himself, and does not rely on the radiologist's reported interpretation, because he "want[s] to see it for [him]self and see if it's normal." [146-47; 176-77]. He explained that he is frequently asked by colleagues (as he was in this case) to review brain MRIs of their own patients for second opinions, and has been told by neuroradiogist colleagues that he is "as good as they

are … in reading those films, MRI scans of the brain." [176]. His deposition testimony (marked as an exhibit at trial) was consistent:

> I can say that, you know, I order an enormous amount of MRI scans …
>
> In general, I probably read more MRI scans of the brain, with and without contrast, than, to the best of my knowledge, a private radiologist who probably reads a lot of chest x-rays and ultrasounds. [677-78; *see also* 664; 681].

### 1.    *Rule 702*

This experience more than qualifies Dr. Landolfi to testify as an expert witness under F.R.E. 702. In order to find that he is not qualified, the trial court would have had to conclude that he had neither knowledge, skill, experience, education **or** training on how to read brain MRIs. *See Kopf, supra.* Dr. Landolfi has them all, and under the cases discussed above, he should not have been precluded from testifying. Any challenge to his testimony was strictly a matter of weight for the jury.

### 2.    *Maryland Law*

These same credentials qualify Dr. Landolfi under Maryland law. The cases interpreting the "related specialty" requirement of CJP § 3-2A-02(c)(2)(ii) all hold that an expert meets that requirement if he or she has experience performing the same "procedure" at issue in the case. *See DeMuth, Nance, Jones, supra.* It is beyond dispute that the "procedure" at issue here is reading brain MRIs, as the trial

court found when it upheld its pre-trial decision to qualify Dr. Bloomfield,

Plaintiffs' neurosurgery expert:

> The procedure in question is interpreting an MRI of the brain. Both Dr. Bloomfield and Dr. Vandermeer [are] qualified by their training and specialties to interpret MRIs of the brain, and both do so in their practice. Therefore, there is an inference that their specialties are related. [271].

In fact, before trial, the court had reached the exact same conclusion

regarding both Dr. Landolfi and Dr. Bloomfield:

> [T]here is no legal basis for the proposition that a neurosurgeon reading an MRI is in such a different position than a radiologist as to disqualify expert testimony as to standard of care.
> Clearly, I'm satisfied there's no dispute with respect to the deposition testimony of either Drs. Bloomfield or Landolfi with respect to what they do on a daily basis in terms of reviewing MRIs. So they're qualified to opine as to standard of care in this case.
> And again, the attacks that have been suggested by [defense counsel] will go to the weight, not the admissibility. [78].

This ruling was correct and there was no reason for the court to deviate from

it. Dr. Landolfi has ample experience with the "procedure" at issue in this case –

interpreting MRIs of the brain. Even defense counsel conceded that Dr. Landolfi

was qualified to read brain MRI. [180 ("We have a gentleman who obviously looks

at imaging studies in the course of his business. That doesn't give me a moment's

pause as relates to the standard of care, the issues that relate to the standard of care

24

in Maryland.")]. Given concessions by both counsel and the court, and the Maryland case law precisely on point, preclusion of Dr. Landolfi's testimony was error.

## C.    The Court Did Not Offer A Satisfactory Explanation For Finding That Dr. Landolfi Was Not Qualified

A careful review of the record reveals that the court never satisfactorily explained its change of opinion regarding Dr. Landolfi's qualifications. At various times the court mentioned different reasons, none of which are proper legal grounds for excluding Dr. Landolfi's testimony.

 First, the court suggested that Dr. Landolfi's *voir dire* testimony about his qualifications was different from what had been proffered in the pre-trial motions hearing. [190]. The court never cited to any difference, and in fact, there was none. Dr. Landolfi's deposition and trial testimony were entirely consistent. [596-726].

Second, the court stated that it found the Maryland cases defining "related" specialty (*Jones, Nance,* and *DeMuth*) to be distinguishable. [186]. Again, the court never explained how so. And again, there is no difference. In fact, the court had relied on the exact same cases to substantiate its pre-trial ruling that Dr. Landolfi's testimony was admissible, stating that the cases were directly on point and supported admission of his testimony. That ruling was correct.

Finally, it appeared that the trial court's reversal of opinion seemed to be fueled by Dr. Landolfi's testimony, on *voir dire* examination, that New Jersey law

precludes him from writing official radiology reports. [185]. This is not true.[11]

New Jersey law in fact expressly allows radiation oncologists and even non-radiologists to provide radiological services:

> Radiological services shall ordinarily be provided only by a physician who is a specialist in radiology, nuclear medicine, and/or radiation oncology. However, a physician, other than one of those listed above, who is a specialist may provide radiological services which are related and limited to his or her own specialty field.

N.J. Admin. Code § 10:54-4.20. Dr. Landolfi more than meets this test: through his performance of Gamma Knife surgery he likely qualifies as a "radiation oncologist," and even if he does not, he still qualifies as a practitioner who can provide radiologic services related to his specialty, like interpreting brain MRI. Furthermore, New Jersey law also recognizes that physicians other than radiologists may be qualified to testify in court regarding their interpretation of radiologic studies.[12] *See Gonzales v. Smith,* No. L-9284-10, 2012 WL 603216 (N.J.

---

[11] Defense counsel did not cite to any alleged New Jersey "law" prohibiting non-radiologists from reading brain MRI. Dr. Landolfi's mistaken "admission" was probably a result of an understanding that his *hospital privileges* do not authorize him to author official radiology reports for patient files – a matter quite different from whether he is legally allowed to do so, and certainly from whether he is allowed to interpret MRI studies.

[12] Defense counsel also erroneously stated during closing argument that it would be "illegal" under New Jersey law for Dr. Bloomfield to testify against a radiologist. [169-170] *See* N.J. Stat. Ann. § 2A:53A-41 (providing exceptions to same board-certification requirement); *Buck v. Henry,* 25 A.3d 240, 247 (N.J. 2011) (stating that the law in New Jersey is "far from a model of clarity").

Super. Ct. App. Div. Feb. 27, 2012) (holding that pain management specialist was qualified based on training and experience to testify about the interpretation of a spine MRI).

More importantly, however, the court's focus on Dr. Landolfi's ability to author radiology reports was misplaced. The issue in this case was not whether Dr. Vandermeer properly authored a written report, it is whether he properly interpreted Mr. Szyjka's MRI and should have seen the abnormality that turned out to be a meningioma. The relevant inquiry in deciding whether Dr. Landolfi should be permitted to opine on this issue looks at his knowledge, training, and experience – not whether a licensing body disallows certain conduct for policy reasons. For example, in Maryland, lawyers are prohibited by the Code of Professional Responsibility from advertising themselves as "specialists" in a particular area of the law, but that does not preclude a court from recognizing a tax lawyer as an expert witness and permitting him to offer opinions in a trial involving a tax dispute. *See* MD. RULE 16-812, MRPC 7.4.

The court's emphasis on the "legality" of Dr. Landolfi's authoring MRI reports is undercut by its (correct) decision to permit Dr. Bloomfield, the Szyjkas' neurosurgeon, to give standard of care testimony. Dr. Bloomfield also does not have privileges to author official radiology reports. In fact, the court offered no reasonable basis for precluding Dr. Landolfi's testimony while allowing Dr.

Bloomfield's; it stated only that it believed Dr. Bloomfield was in a different position because he operates on the brain:

> He is a brain surgeon who necessarily, obviously, must read MRI scans every day. I would … presume he reads them every time he conducts a brain surgery. And necessarily, his field of specialty overlaps with that of a neuroradiologist in I think the ambit of all three of these cases. [*Jones, Nance,* and *DeMuth*]…
> The procedure in question is interpreting an MRI of the brain. Both Dr. Bloomfield and Dr. Vandermeer [are] qualified by their training and specialties to interpret MRIs of the brain, and both do so in their practice. Therefore, there is an inference that their specialties are related. [271].

The **exact same reasoning** applies to Dr. Landolfi. Although he does not use a scalpel, Gamma Knife radiosurgery <u>is</u> brain surgery, and in fact, is highly dependent on MRI for accuracy because it uses radiation beams targeted to a location in the brain determined by MRI. It is inexplicable and irreconcilable that the court permitted Dr. Bloomfield to testify because he reads MRI on a daily basis and in the course of treating brain tumor patients, while precluding Dr. Landolfi from doing the same.

### D.    Dr. Landolfi Had An Adequate "Foundation" For His Opinions

Although the overarching reason for the court's decision seems to be Dr. Landolfi's qualifications, the court also appears to have agreed with Dr. Vandermeer that his opinions "lacked foundation" because he stated, on cross-examination, that he believes every time a radiologist fails to see an abnormality he

sees, that radiologist is negligent. [174; 190-91]. To the extent this served as a basis for the court's ruling, it too constituted error.

Black's Law Dictionary defines "foundation" as: "evidence or testimony that establishes the admissibility of other evidence." BLACK'S LAW DICTIONARY, 9th ed. 2009. Although Dr. Vandermeer and the court were not specific as to which one Dr. Landolfi lacked, F.R.E. 702 contains several "foundation" requirements, all of which were met. Dr. Landolfi was qualified to give expert testimony for the reasons stated above. His opinions were "based on sufficient facts and data" because they were based on his knowledge, training and experience interpreting brain MRIs, and the review of the film at issue in this case. His opinions were the "product of reliable principles and methods;" indeed, under the defense theory, they were arguably the most "reliable" of all because he reviewed the MRI in the course of his routine medical practice as if he were providing care to a patient, instead of at the request of a lawyer or paralegal. In sum, Dr. Landolfi met all of the prerequisites for the admission of expert testimony under Rule 702, and his testimony did not "lack foundation."

There is nothing wrong with Dr. Landolfi's statement that if he can see an abnormality on a film, he believes that reasonable radiologists (or anyone else trained to read brain MRI) should too. Experts in malpractice cases routinely testify based on their own personal experience and based on what they would have

done in the defendant's shoes.[13] This testimony is perfectly acceptable and was not grounds for preclusion.

### E.    Dr. Landolfi's Exclusion Cost The Szyjkas A Fair Trial

The limitation on Dr. Landolfi's testimony caused extreme prejudice to the Szyjkas and deprived them of a fair trial. Dr. Landolfi was the only Plaintiffs' expert who had reviewed Mr. Szyjka's MRI in a "blind" manner, without knowing his clinical outcome, and without even knowing that the film was the subject of litigation. His testimony was their most compelling evidence and their best chance to counter Dr. Vandermeer's relentless "hindsight" defense, and without his opinion that Dr. Vandermeer breached the standard of care, they were left vulnerable to a brutal attack about the trustworthiness of their remaining experts' testimony.

Dr. Latchaw, Plaintiffs' neuroradiologist, was cross-examined at length about his involvement in medical malpractice cases and the manner in which he reviewed this case. [112-136]. In fact, Dr. Latchaw was not asked <u>one</u> question on

---

[13] Even if this testimony demonstrated some lack of understanding of the law, Dr. Landolfi was not a seasoned expert witness versed in legal definitions, and was not required to be. This Court and others have held that an expert's "failure to define or explain the appropriate standard of care in a satisfactory manner is relevant to the witness' credibility as an expert, not the witness' qualifications to testify." *Friendship Heights, supra,* 785 F.2d at 1162. *See also Ellis v. K-Lan Co.,* 695 F.2d 157, 161 (5th Cir. 1983) (holding that the "failure of the expert to be familiar with a statutory definition or standard" is a matter that goes to weight, not admissibility).

cross about his substantive opinions; the entire examination was devoted to discrediting him as a "hired gun" who charged $9,000 per day to appear in court (a fee consistent with what the defense experts charged), and whose testimony was "almost laughable." [508]. Dr. Latchaw admitted that he was contacted by a plaintiff's lawyer to review an MRI that was the subject of litigation. [124-25]. He further testified that he reviewed Mr. Szyjkas' medical records and subsequent 2009 MRI study (showing the growth of the tumor) before he offered his opinions to counsel. [118-123].

Similarly, Dr. Bloomfield, the neurosurgeon, freely admitted that he knew Mr. Szyjkas' clinical outcome and was told by his lawyer that the case involved a "miss." [289]. He also was not asked any questions on cross about his substantive opinions, but rather, was crossed at length about his involvement in medical malpractice cases, admitting that he had worked with Plaintiffs' counsel's firm before; that he earned upwards of $200,000 per year from testifying; that he advertises his expert services on various websites; and that he has attended seminars to educate him about how to effectively testify. [245-64; 316-42]. In closing, he was referred to as the "worst of experts out there." [504].

In stark contrast to these experts (and even Dr. Vandemeer's own), Dr. Landolfi was clearly not a seasoned expert comfortable with the witness stand, and in fact, this was his first trial. [211; 657-59]. He had absolutely no idea that the

MRI was the subject of litigation; in fact, he was the <u>only</u> expert in the entire trial to have read it in the course of his clinical practice, believing that he was offering an opinion about a colleague's patient. He knew <u>no</u> information about the "patient," and did not ever see the follow-up MRI from 2009 until he agreed to serve as an expert. Among all of the experts, including Dr. Vandermeer's – who knew that the MRI was the subject of litigation and had clinical information about Mr. Szyjka – this review was the *most* "prospective," *most* neutral and *most* resembled the circumstances facing Dr. Vandeermeer himself.

This distinction made all the difference in the world considering Dr. Vandermeer's defense, and the trial court knew that his testimony was critical to Plaintiffs for this reason. [192]. In opening, on cross of Plaintiffs' experts, on the direct of his own experts, and for almost his entire closing argument, Dr. Vandermeer argued vehemently that the "blind review" process used by his experts was the <u>only</u> way to ensure an unbiased opinion that comported with the manner in which he had reviewed Mr. Szyjka's MRI. He contrasted this "fair" method with the review by the "hired" "actors" Drs. Latchaw and Bloomfield, which he argued was not only unfair, but also, against Maryland law.

Dr. Landolfi was the Szyjkas' response to this attack, but they were silenced from using him. Although Dr. Landolfi was allowed to explain how he became involved in the lawsuit, this testimony was ultimately useless because Plaintiffs

were forbidden from tying that testimony to his opinion that Dr. Vandermeer breached the standard of care, and from arguing that the fact that Dr. Landolfi saw the abnormality was evidence that Dr. Vandermeer should have too. In fact, the court granted Dr. Vandermeer's motion to preclude that argument, and also *sua sponte* crafted a jury instruction that the <u>only</u> Plaintiffs' testimony that could be considered on the issue of standard of care was that of Drs. Latchaw and Bloomfield. [433-37].

Without being able to argue that Dr. Landolfi performed a "prospective," non-"hindsight" review, and without being able to rely on his opinion that Dr. Vandermeer breached the standard of care, the Szyjkas had absolutely no ammunition to counter Dr. Vandermeer's principal defense. This inability was devastating, and ultimately, fatal. Reversal is required to cure the court's error and ensure the Szyjkas a fair trial.

### III. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD NOT EVALUATE DR. VANDERMEER'S CARE IN "PERFECT HINDSIGHT"

Compounding the court's error with respect to Dr. Landolfi and causing further prejudice to the Szyjkas was the court's decision to instruct the jury that it could not evaluate Dr. Vandermeer's care "retrospectively" or "as seen in perfect hindsight:"

> A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively.

33

> If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the doctor is not liable for malpractice. [451-55; 563].

This non-pattern instruction has never been sanctioned by the Maryland Court of Appeals. It was confusing, misleading, and unfairly prejudicial to the Szyjkas. By giving it, the court judicially endorsed and enabled Dr. Vandermeer to argue that reviewing the reasonableness of an MRI interpretation after the fact was illegal and contrary to Maryland law.

### A.    The Court Of Appeals Has Never Approved A "Retrospect" or "Perfect Hindsight" Instruction

The giving of this, or any, "retrospect" or perfect hindsight" instruction in a malpractice case has never been sanctioned by the Maryland Court of Appeals, and the instruction has never been adopted by the Maryland State Bar Association's Standing Committee on Jury Instructions.[14] The appellate courts of Maryland have cautioned trial courts against deviating from the pattern instructions – an admonition the trial court in this case stated it was inclined to uphold. [314; 456]. *See Green v. State*, 736 A.2d 450, 457 (Md. Ct. Spec. App. 1999); *Minger v. State,* 849 A.2d 1058, 1060 n. 1 (Md. Ct. Spec. App. 2004). Indeed, the Court of Appeals

---

[14] In *Hetrick v. Weimer*, 67 Md. App. 522 (Md. Ct. Spec. App. 1986), a three-judge panel of the Court of Special Appeals refused to reverse a trial court's decision to give a similar instruction, but did not really explain why. That decision was reversed by the Court of Appeals on different grounds. *See Weimer v. Hetrick,* 309 Md. 536 (Md. 1987).

has stated that not all language from appellate opinions should be used to formulate jury instructions, as doing so "may not adequately inform jurors of their responsibility." *Kennelly v. Burgess,* 654 A.2d 1335, 1340 (Md. 1995).

The lack of Maryland authority on the propriety of the "hindsight" instruction is compelling evidence that the instruction should not have been given. *See id.* at 1341-42 (striking down "mere happening" instruction in a malpractice case and stating that the absence of such an instruction in the Maryland Pattern instructions was "further recognition of the undesirability of such an instruction").

### B.    The Instruction As Given Was Confusing, Misleading, And Blessed Dr. Vandermeer's Defense With Judicial Imprimatur

Even more troubling than the lack of Maryland authority supporting the court's "perfect hindsight" instruction is that the instruction, as given and as applied to the facts of this case, was confusing, misleading, and judicially sanctioned Dr. Vandermeer's theory of the case.

The Maryland pattern instruction defining medical negligence is clearly sufficient to delineate the scope of the jury's inquiry, and there was no need to elaborate on it.[15] Injecting the defense concepts of "retrospect" and "perfect hindsight" simply confused that inquiry, taking the jury's focus away from the

---

[15] *See* MPJI-Civil 27:1 ("A health care provider is negligent if the health care provider does not use that degree of care and skill which a reasonably competent health care provider, engaged in a similar practice and acting in similar circumstances, would use.")

determination of the reasonableness of Dr. Vandermeer's conduct based on the information he had at the time. Additionally, it was simply wrong to tell the jury that it was not permitted to "view" the conduct "retrospectively," and that it should not "see" the conduct "in perfect hindsight." This instruction directed the jury to do the impossible, for its inquiry *must* be conducted after the fact, in hindsight, and in retrospect.

The instruction also had a high potential for misapplication. Particularly, use of the word "perfect" suggested that the Plaintiffs' case was based on unreasonable expectations of "perfect" conduct (something no jury would ever find), and that if the jury believed that Dr. Vandermeer's conduct was anything short of "perfect," it could excuse him. The danger with such an instruction was articulated in Judge Chasanow's opinion eschewing the "mere happening" jury instruction in malpractice cases. In *Kennelly v. Burgess, supra,* the Court of Appeals held that a trial court committed reversible error when it instructed the jury that "an unsuccessful result following medical treatment is not evidence of negligence." The court explained that the instruction "implied that the jury should give no consideration at all to the unsuccessful medical treatment," and "served to negate the potential evidentiary value" of the adverse outcome. 654 A.2d at 1341. It also held that the instruction "lead to confusion in the minds of jurors as to the weight

to be given to the unsuccessful result in determining negligence." *Id.* These same

principles apply to the instruction given here.

Other courts that have faced challenges to similar jury instructions have

explained why they are confusing and misleading. In *Yates v. University of West

Virginia Board of Trustees,* 549 S.E.2d 681 (W.Va. 2001), the highest court of

West Virginia held that it was reversible error to instruct the jury that "reasonable

and honest mistakes of judgment" were not malpractice. The court explained that

such an instruction "wrongly injects subjectivity into an objective standard of

care." *Id.* at 690. The concurring opinion analogized the instruction to a

"hindsight" instruction, holding that both "employ[] argumentative terms,

subjective terms, or terms designed to obfuscate the doctor's simple duty: to act as

a reasonable health care provider under similar circumstances." *Id.* at 693. It stated:

> The theme of these instructions is similar: people make mistakes, and when they do, they should be forgiven. While this may be a good rule by which to live, it is not the legal standard by which a tortfeasor is judged. Neither these instructions nor ones similar to them should be given to a jury.
>
> The rule in every tort case is that a defendant owes the plaintiff a duty of care; when a breach of that duty proximately causes another harm, the defendant should be liable for that harm. **Whether it was an honest "mistake of judgment," or whether the harm wasn't prophesied by the defendant is irrelevant.**
>
> …
>
> The fact-finder should not be distracted by subjectively-stated instructions which muddle the defendant's duty. *Id.* at 693-94 (emphasis added).

*See also Pringle v. Rapaport,* 980 A.2d 159, 172 n. 6 (Pa. Super. Ct. 2009) (*en banc*) (disapproving of "error in judgment" instruction and citing "a substantial number of other states [that] have ruled that the use of 'error in judgment' instructions are never proper in medical malpractice cases").

Most importantly, however, the instruction gave undue deference to Dr. Vandermeer's theory of the case and amounted to a judicial statement that the court agreed with the defense theory. Indeed, knowing that the court was going to give the "perfect hindsight" instruction emboldened defense counsel to argue that reviewing an x-ray after it had been originally interpreted was actually illegal under Maryland law:

> Maryland law prohibits using hindsight to evaluate Dr. Vandermeer's interpretation. They did it with both of them, because that's how you get a good result. …
> They [Plaintiffs' experts] looked at this case inconsistent with the standard of care in Maryland. [500].
> ….
> That's exactly what Maryland law says, to not do that. That is a hindsight interpretation of the study. You know what the outcome is. [506].
> ….
> When you set it up to find an abnormality, when you stack the deck, there's no surprise about this. Maryland law says this is absolutely wrong, and it is not fair. [512-13].
> ….
> Why is a fair review important? Because Maryland law says it is. [516].

Counsel even asked the jurors to substitute the standard of care question on the verdict sheet, instead asking themselves whether the Szyjkas' experts' hindsight "review process" was fair. [521-22]. It is utterly outrageous to suggest that the <u>only</u> "legal" or "fair" way for an expert to evaluate a medical malpractice case is "blindly," but the court's instruction inspired and legitimized this specious argument.

The proof that the instruction actually misled and confused the jury was the question that it asked, four and a half hours into its deliberations: "If a doctor makes a decision that proves to be incorrect, does that breach the standard of care?" [575; 727]. The court was under the legally incorrect belief that the "correct" answer to this question was "clearly no." [575-76]. That was <u>not</u> the correct answer. As pointed out by Plaintiffs, the correct answer was "it depends" – some "incorrect decisions" may be unreasonable and therefore constitute negligence, and other "incorrect decisions" may be reasonable even though they turn out to be wrong. [578].

Instead of answering the question by only repeating the pattern instruction or telling the jury that it should decide whether Dr. Vandermeer's conduct was reasonable based on information he had at the time, the court simply re-read the biased "retrospect" and "perfect hindsight" instructions – an answer that placed more emphasis on the defense's "hindsight" theme. Re-reading these instructions

virtually directed a verdict in Dr. Vandermeer's favor (particularly the one-sided last phrase instructing the jury "the doctor is not liable for malpractice").

Indeed, within a half hour, the jury did so. This is compelling evidence that the court's instruction caused severe prejudice to Plaintiffs, and directly affected the verdict. The only was to correct this error and prejudice is to award a new trial.

## **CONCLUSION**

For all of these reasons, and those to be argued at Oral Argument, Appellants Roman and Paula Szyjka request that this Court reverse the judgment of the District Court and remand for a new trial.

_James O'C Gentry_ _____
James O'C Gentry
Emily C. Malarkey
SALSBURY, CLEMENTS, BEKMAN,
    MARDER & ADKINS LLC
300 W. Pratt St., Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellants*

## REQUEST FOR ORAL ARGUMENT

Appellant hereby requests oral argument pursuant to Local Rule 34(a).

_James O'C Gentry_____
James O'C. Gentry
Emily C. Malarkey
SALSBURY, CLEMENTS, BEKMAN,
   MARDER & ADKINS LLC
300 W. Pratt St., Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## No. 14-1439

### *Paula Szyjka, et al.*

### *v.*

### *Peter Vandermeer, et al.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,751 (less than 14,000) words of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)B)(iii), as verified by Microsoft Word for Mac 2011.

2.     I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in size 14 Times New Roman type.


_10/24/14_____         ___*Emily C. Malarkey*_____
Date                          Emily C. Malarkey
                              *Attorney for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October, 2014, I served Appellants'

Opening Brief upon the Appellees by electronic filing and by mailing a copy, first

class, postage pre-paid, to:

Andrew Vernick
Matthew Chalker
Vernick & Associates, LLC
111 Annapolis Street
Annapolis, MD 21401
*Attorneys for Appellees Peter Vandermeer, M.D. and Advanced Radiology P.A.*

John Sly
Nicole McCarus
Waranch & Brown LLC
1301 York Road, Suite 300
Lutherville, MD 21093
*Attorneys for Baltimore Washington Medical Center*

_____*Emily C. Malarkey*_____
Emily C. Malarkey
*Attorney for Appellants*