No. 14-1439

_____

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

*Paula Szyjka, et al.*

**Appellants**

**v.**

*Peter Vandermeer, et al.*

**Appellees**

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

Brief of Appellees Peter Vandermeer, M.D., Advanced Radiology, P.A. and
Baltimore Washington Medical Center, Inc.

_____

**ANDREW E. VERNICK**
**MATTHEW J. CHALKER**
**VERNICK & ASSOCIATES, LLC**
**111 Annapolis Street**
**Annapolis, Maryland 21401**
**(443) 333-4044**
*Attorneys for Peter Vandermeer, M.D.*
*and Advanced Radiology, P.A.*

**JOHN T. SLY**
**NICOLE M. DEFORD**
**WARANCH & BROWN, LLC**
**1301 York Road, Suite 300**
**Lutherville, Maryland 21093**
**(410) 821-3500**
*Attorneys for Baltimore Washington*
*Medical Center, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                         YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                         YES     NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)        YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                              YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
        (signature)                                         (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1439__          Caption: __Szyjka v. Vandermeer, Advanced Radiology PA & BWMC, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Baltimore Washington Medical Center, Inc.__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations? ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      University of Maryland Medical System

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____         Date: ___May 19, 2014___

Counsel for: __BWMC, Inc._____

## CERTIFICATE OF SERVICE
****************************

I certify that on ___May 19, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

James O'C Gentry, Jr. (Fed Bar #29797)
Emily C. Malarkey (Fed Bar #28197)
Salsbury, Clements, Bekman, Marder & Adkins, LLC
300 W. Pratt Street, Suite 450
Baltimore, Maryland 21201
gentry@scbmalaw.com
malarkey@scbmalaw.com

Andrew Vernick, Esq.
Matthew J. Chalker
Vernick & Associates, LLC
104West Street
Annapolis, Maryland 21401
avernick@vernicklegal.com
mchalker@vernicklegal.com

_____          ___May 19, 2014___
(signature)                              (date)

# **TABLE OF CONTENTS**

Rule 26.1 Corporate Disclosure Statement of Advanced Radiology, P.A.

Rule 26.1 Corporate Disclosure Statement of Baltimore Washington Medical Center, Inc.

Table of Authorities……………………………………………………………..iv

Relevant Procedural History…………………………………………………….1

Summary of the Argument……………………………………………………..11

Argument…………………………………………………………………….13

    I.      STANDARD OF REVIEW……………………………………13

    II.    THE TRIAL COURT'S DECISION TO PRECLUDE JOSEPH LANDOLFI, M.D. FROM OFFERING STANDARD OF CARE TESTIMONY WAS CONSISTENT WITH STATE AND FEDERAL LAW AND THEREFORE, NEITHER CLEARLY ERRONEOUS NOR AN ABUSE OF DISCRETION………………………………15

        A. Application of the Act and Rule 702 to the instant case…………16

        B. The trial court correctly applied the Act and its ruling that Dr. Landolfi failed to satisfy the "qualification prerequisite" set forth in § 3-2A-02(c)(2) was not clearly erroneous………………………19

            1. Dr. Landolfi's qualifications………………………………20

              i. Final decision making……………………………………..20

              ii. Dr. Landolfi's other qualifications and foundation………..21

            2. Dr. Bloomfield's qualifications compared to Dr. Landolfi's…23

            3. The trial court's determination to preclude Dr. Landolfi from offering standard of care testimony was well-reasoned, based on

the facts before it and not clearly erroneous or an abuse of discretion……………………………………………………...24

   i.  The trial court's analysis under the Act as to Dr. Landolfi….24

   ii.  The trial court's analysis under the Act as to Dr. Bloomfield……………………………………………………27

   iii.  The trial court's analysis as to Dr. Landolfi under Federal Rule of Evidence 702…………………………………...28

C. The exclusion of Dr. Landolfi's standard of care opinion did not prejudice Plaintiffs by costing them a fair trial…………………...30

   1. Standard………………………………………………………31

   2. Without conceding that the trial court made reversible error, even if it did, any error was harmless………………………………31

III.   THE HINDSIGHT INSTRUCTION GIVEN BY THE TRIAL COURT WAS WARRANTED UNDER THE CIRCUMSTANCES AND WAS A CORRECT STATEMENT OF MARYLAND LAW……………..35

A. Standard……………………………………………………………….35

B. The "hindsight" instruction, as given by the trial court, was an accurate statement of Maryland law……………………………...38

C. The theory of Plaintiffs' case warranted the trial court's charge of the jury with the "hindsight" instruction…………………………44

D. The "hindsight" instruction was not misleading, confusing or prejudicial……………………………………………………………..50

Conclusion………………………………………………………………........51

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

<u>Aleshire v. State</u>, 170 A.2d 758 (Md. 1961)……………………………………….35

<u>Anderson v. Bessemer City</u>, 470 U.S. 504 (1985)…………………………………13

<u>Arthur v. State</u>, 24 A.3d 667, 677 (Md. 2011)…………………………………36, 50

<u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514 (4th Cir. 2003)…15

<u>Breidor v. Sears, Roebuck and Co.</u>, 772 F.2d 1134 (3rd Cir. 1983)………………19

<u>United States v. Cherry</u>, 330 F.3d 658 (4th Cir. 2003)………………………..15, 35

<u>Cooper v. Smith & Nephew, Inc.</u>, 259 F.3d 194 (4th Cir. 2001)………………….13

<u>Davison v. Sinai Hospital of Baltimore, Inc.</u>, 617 F.2d 361 (4th Cir. 1980)……….16

<u>Davison v. Sinai Hospital of Baltimore, Inc.</u>, 462 F.Supp. 788 (D. Md. 1978)……16

<u>Demuth v. Strong</u>, 45 A.3d 898 (Md. Ct. Spec. App. 2012)…………..18, 20, 24, 26

<u>Douzart v. Jones</u>, 528 So.2d 602 (La. App. 2d Cir. 1988)…………………………43

<u>East v. United States</u>, 745 F. Supp. 1142 (D. Md. 1990)………………39, 42, 43, 44

<u>Educ. Credit Mgmt. Corp. v. Frushour</u>, 433 F.3d 393 (4th Cir. 2005)……………13

<u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938)………………………………16

<u>Evans v. Eaton Corp. Long Term Disability Plan</u>, 514 F.3d 315 (4th Cir. 2008)…14

<u>Friendship Heights Assoc. v. Vlastimil Koubek</u>, 785 F.2d 1154, 1159 (4th Cir. 1986)……………………………………………………………………………19

<u>GE v. Joiner</u>, 522 U.S. 136 (1997)…………………………………………………13

Goodie v. United States, 2013 U.S. Dist. LEXIS 33854, 42-43 (D. Md. Mar. 12, 2013)……………………………………………………………………….43, 44

Green v. State, 705 A.2d 133 (Md. Ct. Spec. App. 1998)…………………35, 36, 39

Hetrick v. Weimer, 525 A.2d 643 (Md. 1986)……………………………………41

Hetrick v. Weimer, 508 A.2d 522 (Md. Ct. Spec. App. 1986)……………39, 40, 43

James v. Jacobson, 6 F.3d 233 (4th Cir. 1993)……………………………………14

Jones v. Bagalkotakar, 750 F.Supp. 2d 574 (D. Md. 2010)……….16, 18, 20, 24, 26

Kennelly v. Burgess, 654 A.2d 1335 (Md. 1995)……………………………...35, 39

Macguineas v. United States, 738 F. Supp. 566 (D.D.C. 1990)……………39, 40, 44

Myles v. Laffitte, 1993 U.S. App. LEXIS 3274
(4th Cir. Feb. 16, 1993). . . ……………………………………………41, 42, 43, 48

Nance v. Gordon, 62 A.3d 185 (Md. Ct. Spec. App. 2013)……………….18, 20, 24

Oglesby v. Gen. Motors Corp., 190 F.3d 244 (4th Cir. 1999)……………………19

Pandezides v. Virginia Bd. of Educ., 13 F.3d 823 (4th Cir. 1994)…………………13

Perez v. State, 29 A.3d 656 (Md. Ct. Spec. App. 2011)……………………………35

Rowland v. Patterson, 882 F.2d 97 (4th Cir. 1989)………………………………..16

Shilkret v. The Annapolis Emergency Hosp. Assoc., 349 A. 2d 245 (Md. 1975)…29

Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)………19

United States v. Passaro, 577 F.3d 207 (4th Cir. 2009)……………………14, 35, 44

United States v. Vinson, 886 F.2d 740 (4th Cir. 1989)……………………………13

Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474 (4th Cir. 2007)……………………………………………………………………..15, 35

Zeller v. Greater Baltimore Medical Center, 506 A.2d 646 (Md. Ct. Spec. App. 1986)……………………………………………………………………………29

## Statutes and Rules

Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-01, *et seq*…………………………6, 16

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(a)(1)……………………………16, 17

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02……………….....11, 13, 16, 17, 20, 24

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(c)…………………………..15, 16, 21

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02 (c)(2)………………....16, 18, 19, 20

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(c)(2)(ii)(1)…………………………17

Federal Rule of Evidence 103……………………………………………………..31

Federal Rule of Evidence 702………………..6, 11, 15, 17, 18, 19, 20, 28, 29, 30

Federal Rule of Appellate Procedure 28(b)……………………………………..13

28 U.S.C. § 2111………………………………………………………………..31

Federal Rule of Appellate Procedure 32.1(b)…………………………………...41

United States Court of Appeals for the Fourth Circuit Local Rule 32.1(b)………..41

## Other Authority

Maryland Civil Pattern Jury Instructions, Fourth Ed., Preface………………..36, 37

Maryland Civil Pattern Jury Instructions, Fourth Ed., General Explanatory Notes on Use……………………………………………………………………………...37

Maryland Civil Pattern Jury Instruction, 27:1…………………………………..37

## RELEVANT PROCEDURAL HISTORY

Appellants, Roman and Paula Szyjka filed suit against Appellees Peter Vandermeer, M.D.,[1] Advanced Radiology, P.A., and Baltimore Washington Medical Center, Inc. ("BWMC") in September 2012.

*Plaintiffs' Experts*

During the discovery process, the Szyjkas ("Plaintiffs" or "Appellants") identified three experts for the purpose of offering standard of care opinions as they related to the standard of care to which Dr. Vandermeer was held: Richard Latchaw, M.D.,[2] a neuroradiologist; Stephen M. Bloomfield, M.D., a neurosurgeon; and Joseph Landolfi, D.O., a board-certified neurologist who also practices as a neuro-oncologist.[3] All three experts testified at deposition that they reviewed or interpreted MRI studies on a daily basis and that Dr. Vandermeer had violated the standard of care in his interpretation and reporting of Mr. Szyjka's ("Plaintiff") brain MRI on January 11, 2008.

---

[1] Dr. Vandermeer is a board-certified radiologist. He is not board-certified in neuroradiology.

[2] Dr. Latchaw was designated by Plaintiffs following the completion of all defense standard of care experts' depositions and less than two months before trial as a result of the death of Plaintiffs' first neuroradiology expert, Lucien Levy, M.D.

[3] Drs. Bloomfield and Landolfi were also designated for the purpose of offering causation and damages opinions as they related to the availability of gamma knife surgery as a treatment and the likelihood of success thereof.

Dr. Latchaw's standard of care review of the at-issue imaging study, which he reviewed in conjunction with information Dr. Vandermeer did not have at the time of his review, including the subsequent 2009 diagnostic-imaging study and medical records [122] occurred under the assumption that an abnormal finding was present in the at-issue image. [128-29 (reasonable to assume during his review that an injury was present)]. Similarly, Dr. Bloomfield knew that a meningioma was present in the January 11, 2008 MRI when he conducted his standard of care review. [289]. Prior to his review, Plaintiffs' counsel informed him "that there was a case where an initial scan missed the diagnosis, and that eventually a meningioma was found." [Id.]. As a result, he immediately looked at the image in question. [Id.]. The litigation tactic employed with Drs. Latchaw and Bloomfield, informing experts of the outcome prior to the expert's review of the at-issue imaging study, is the same strategy that Plaintiffs' counsel employs in all of their cases. [536].

Like Drs. Latchaw and Bloomfield, Dr. Landolfi's review of the January 11, 2008 MRI occurred after being directed to the at-issue image, and the at-issue image alone, by Dr. Bloomfield. Specifically, Dr. Landolfi walked into Dr. Bloomfield's office where he immediately saw the image in question on Dr. Bloomfield's computer screen. [210-11]. Dr. Bloomfield then asked Dr. Landolfi to look at the image and tell him "what I think." Id.

*Defendants' Experts*

Defendants designated, among other experts, James Abrahams, M.D., a board-certified neuroradiologist; Frank Berkowitz, M.D., a board-certified neuroradiologist; Jason Sheehan, M.D, a board-certified neurosurgeon; Jeff Jacobson, M.D., a board-certified neurosurgeon; and Douglas Miller, M.D., a board-certified neuropathologist.[4]  Drs. Abrahams and Berkowitz conducted their initial review of this case through a "blinded review" process, described below.  Both testified during deposition, and later at trial, to the standard of care to which Dr. Vandermeer was held and also that Dr. Vandermeer did not violate the standard of care in his interpretation of Mr. Szyjka's brain MRI on January 11, 2008.

The "blinded review" process engaged in by Drs. Abrahams and Berkowitz began Defendants' pursuit of standard of care experts when they sent to potential experts a set of 10 imaging studies which included the imaging study from the January 11, 2008 MRI ("litigation study").  The other nine studies, all of which were HIPPA compliant, consisted of MRIs of the brain and spine and CTs of the head and were randomly selected and included in a set with the litigation study to provide the reviewing experts a reasonable simulation of the circumstances under which radiologists interpret images in a clinical setting.  The experts who received the

---

[4] Defendants called Dr. Sheehan, Dr. Jacobson and Dr. Miller to offer opinions on causation and damages.

blinded study were not told prior to review which of the 10 imaging studies was the litigation study and participated in this blinded review process without knowing which side defense counsel represented.[5]  Plaintiffs' experts did not engage in this or any similar process.

## Trial

Trial in this case began on March 31, 2014.  During opening statements, Plaintiffs' counsel placed before the jury the January 2008 image in question and repeated multiple times while pointing to the area ultimately diagnosed as a meningioma, "everybody can see it" and "you can eyeball it." [91].

Plaintiffs' opening statement continued to focus on the jury's ability to "eyeball" the tumor, with Plaintiffs' counsel arguing, "He can eyeball it.  You can eyeball it.  And he should be able to interpret it as something unusual."  [92]. Plaintiffs' counsel continued framing the "hindsight" theory of their case by submitting that if "you," the jury, can "eyeball it," Dr. Vandermeer is legally responsible [99-100] – a legally incorrect statement of the standard of care.

During Defendants' opening statement, Defendants' counsel attempted to reframe Plaintiffs' opening statement to accurately reflect Maryland law, explaining to the jury that the standard of care to which Dr. Vandermeer was held was not a

---

[5] Each of the 10 imaging studies sent by Defendants to the reviewing experts, including Drs. Abrahams and Berkowitz, included tens, if not, hundreds of individual images.

hindsight-if-you-can-eyeball-it standard but rather, what a doctor under similar circumstances would have done. [101-107].

*Plaintiffs' Experts*

Plaintiffs first called Dr. Latchaw, a neuroradiologist, to offer standard of care testimony. As noted, Dr. Latchaw was not designated until after all defense depositions had been completed and the "blinded" review process utilized by the defense had been completely disclosed. In spite of this knowledge, he did not engage in a blinded review of the imaging study in question. He was offered and accepted as an expert in radiology and the interpretation of brain MRIs without objection. Dr. Latchaw opined that Dr. Vandermeer violated the standard of care to which he was held by not reporting the presence of an abnormality in Mr. Szyjka's brain.

Plaintiffs then called Dr. Landolfi, a neuro-oncologist, for the purpose of offering standard of care opinions against Dr. Vandermeer, a radiologist, as well as to offer causation and damages opinions. Plaintiffs offered Dr. Landolfi as an expert in interpretation of brain MRIs and causation and damages topics; Defendants' *voir dire*, addressed more thoroughly in Section IIB1, <u>infra</u>, ensued. During Defendants' *voir dire* of Dr. Landolfi, he testified 1) that he did not pursue a residency or fellowship in radiology; 2) that although he reviews MRI scans himself, he relies "on the radiologist's final report to make the final decision" [174]; 3) that he does not generate radiology reports and that in fact, he was not permitted to generate such

reports.  [164].  Most importantly, Dr. Landolfi testified that the foundation for his opinion was that Dr. Vandermeer violated the standard of care if he, Dr. Landolfi, " can see the tumor or see something that's abnormal that the radiologist does not identify as abnormal, every time that radiologist has violated the standard of care, period[.]"  [174].

Following *voir dire*, Defendants objected to Plaintiffs' proffer of Dr. Landolfi as an expert in interpreting MRIs of the brain.  [179].  In support of that objection, Defendants argued two grounds: 1) that Dr. Landolfi's practice, based on his testimony, was not sufficiently overlapping with the field of radiology as required by Maryland's Health Care Malpractice Act, Md. Code Ann. Cts. & Jud. Proc. Art. § 3-2A-01, *et seq.* ("the Act") to permit him to render standard of care opinions against radiologists [182-83], and 2) the foundation for Dr. Landolfi's opinion, "if I can see it and a radiologist does not, it is a violation of the standard of care," was insufficient under Federal Rule of Evidence ("F.R.E.") 702.  [180].

Relying on the applicable state and federal law and in consideration of Dr. Landolfi's testimony, the trial court ruled: 1) that Dr. Landolfi did not satisfy the Act's prerequisite qualification requirement of practicing in a "related field" because his practice did not sufficiently overlap with Dr. Vandermeer's [179-200]; and 2) that Dr. Landolfi did not satisfy the requirements of F.R.E. 702 because "for him to say if he sees a tumor and a radiologist does not, then that violates a standard of care,

6

is not an adequate predicate for him to provide an expert opinion. Plain and simple." [199]. As a result, the trial court ruled that Dr. Landolfi would not be permitted to testify to the standard of care to which Dr. Vandermeer was held in the interpretation of Mr. Szyjka's January 11, 2008 brain MRI.[6] [179-200].

Plaintiffs next called Dr. Bloomfield, a board-certified neurosurgeon. Plaintiffs offered Dr. Bloomfield as an expert in interpretation of brain MRIs and causation and damage topics. During *voir dire*, Dr. Bloomfield testified that he received training in the reading of brain MRIs "[o]n a daily basis" prior to completing his residency and fellowship and completed six months of residency training exclusively in neuroradiology alongside radiology residents. [236-37]. He also testified that he interprets "imaging studies and make reports and send[s] them out to my colleagues and to the referring doctors." [259]. He also explained that when he was employed by West Virginia University, he was involved in teaching neuroradiology fellows and regular radiology residents and that he continues to give

---

[6] Prior to trial, Defendants filed a motion *in limine* to preclude Drs. Bloomfield and Landolfi from offering standard of care opinions at trial, arguing that neither possessed sufficient knowledge or qualifications necessary to render an expert opinion as to whether Dr. Vandermeer complied with the applicable standard of care. [26-32]. Addressed below, there was no argument included regarding the foundation for Dr. Landolfi's opinion. Testimony was not taken from any witness at the hearing on this motion. Based on deposition testimony and argument of counsel, the trial court denied the motion on March 19, 2014. [83]. Plaintiffs take issue with the fact that the trial court excluded Dr. Landolfi at trial in light of this ruling. However, there is no rule or precedent that prevents a trial court from issuing a new ruling when factually and legally warranted.

lectures at the New Jersey Medical School to radiology and neuroradiology residents and to radiology residents at Robert Wood Johnson Medical Center. [262]. Nevertheless, Dr. Bloomfield testified that he lacked credentials as they related to the ability to practice radiology and to generate formal radiology reports. On this ground, Defendants objected to Plaintiffs' offer of Dr. Bloomfield as an expert in the interpretation of brain MRIs.

The trial court overruled Defendants' objection to Dr. Bloomfield as an expert in brain MRI interpretation and permitted him to offer standard of care opinions as they related to Dr. Vandermeer. Dr. Bloomfield testified, like Dr. Latchaw, that Dr. Vandermeer violated the standard of care by not reporting the presence of an abnormality in Mr. Szyjka's brain. Thus, like Defendants (explained below), the jury heard from two standard of care experts on behalf of Plaintiffs.

*Defendants' Experts*

On the issue of standard of care, Defendants first called Dr. Berkowitz (board-certified neuroradiologist). Dr. Berkowitz opined that Dr. Vandermeer did not violate the standard of care. Consistent with their theory of the case, Plaintiffs cross-examination focused on what Dr. Berkowitz knew "now." Plaintiffs' counsel inquired:

> A: . . . I concluded this was a normal structure.
> Q: Of course, you now know you were wrong, right?
> A: I did eventually see the study from 2009, and I do understand that this was the beginnings of a tumor, yes.

8

Q: So you now know you were wrong?
A: In retrospect looking back on it, I was not correct.  [358-59].

Defendants then called Dr. Abrahams (board-certified neuroradiologist).  Like Dr. Berkowitz, Dr. Abrahams opined that Dr. Vandermeer did not violate the standard of care.  Plaintiffs continued to press their "hindsight" theory of the case, asking Dr. Abrahams whether, knowing what he knew "right now," he felt his initial interpretation was wrong. [373].  This line of questioning resulted in objection:

> Defendants' Counsel: My objection grows out of the question of this witness as to whether he would have been wrong.  I believe this misstates the standard of care in Maryland to ask this doctor in hindsight about whether his interpretation was right or wrong. [375].

Following this objection (which was similar to other objections raised throughout the course of the trial to similar lines of questioning), the trial court expressed its concern regarding Plaintiffs' line of questioning, stating: "You're certainly free to say that it turns out this was incorrect, or that there was a meningioma, but the question it would be wrong is an improper question."  [376].  The trial court continued:

> "[T]o say that it would be wrong means it's wrong in terms of analysis or standard of care, which is up to the jury to determine. So that objection is well-founded and is sustained.  So if you can just rephrase it in terms of how you approached it, but don't ask any witness [whether] it would be wrong because they didn't notice it at the time."  Id.

9

Defendants called Dr. Vandermeer last. During cross-examination of Dr. Vandermeer, Plaintiffs' counsel used a photograph of the salient MRI image with a red arrow to identify the area that was later diagnosed as a meningioma and repeatedly asked Dr. Vandermeer, consistent with the above line of questioning, whether "looking at this film today . . . looking at it right now, is that abnormal?" See, e.g., [430].

Throughout the course of the trial, Plaintiffs' counsel repeatedly utilized this photograph of the image to draw specific attention to the area on the January 2008 MRI that was ultimately diagnosed as a meningioma, alternatively using circles and arrows. See, e.g., [375, 430].

*Closing*

During closing arguments, Plaintiffs' counsel again focused the juror's attention on whether in hindsight they could "eyeball" or see the abnormality on the MRI images. [461]. During rebuttal close, Plaintiffs' counsel argued that Dr. Vandermeer's practice should not be judged prospectively [543] and instructed the jury, "if you can see it, so should he." [546].

*Jury Instructions*

Because of Plaintiffs' continued emphasis on what the jury could "eyeball" and cross-examination questions about whether Defendants' experts "now knew" they were "wrong," Defendants requested the trial court instruct the jury that Dr.

10

Vandermeer could not be judged in hindsight.  Following argument from all parties,

the trial court ultimately charged the jury with the following modified instruction:

> A health care provider is negligent if he does not use that degree of care and skill which a reasonably competent healthcare provider engaged in a similar practice and acting in similar circumstances would use.
> A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively.
> If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the doctor is not liable for malpractice.  [563].

Following deliberations, the jury returned a verdict in favor of Dr.

Vandermeer, finding that he did not violate the standard of care.

## SUMMARY OF THE ARGUMENT

The trial court's decision to preclude Dr. Landolfi from offering standard of

care testimony was a correct ruling.  The trial court's ruling that Dr. Landolfi did not

satisfy the § 3-2A-02 "qualification prerequisite" was not clearly erroneous and its

ruling that Dr. Landolfi did not possess a sufficient foundational predicate upon

which to offer a standard of care opinion against Dr. Vandermeer as required by

F.R.E. 702 was not an abuse of discretion.

Moreover, the trial court's ruling, founded on the evidence before it, did not

prejudice Plaintiffs because like Defendants, they were permitted to call two

standard of care experts at trial, both of whom, by Plaintiffs' own representations for

11

nearly one year, and by the trial court's ruling, were qualified to offer such testimony. Plaintiffs also argue that because Dr. Landolfi was not permitted to offer standard of care testimony, they were stripped of the ability to present "blinded review" based opinion testimony, thereby suffering prejudice. In reality, Plaintiffs never intended to present such testimony and only now assert otherwise in an attempt to achieve a reversal of the jury's verdict so that they can have a "do-over." Consider that only two months before trial, after Defendants' entire blinded review process had been disclosed, Plaintiffs failed to engage Dr. Latchaw in a "blinded review" process. Their actions indicate that they did not believe this process was important. The trial court's ruling relative to Dr. Landolfi did not strip Plaintiffs of the ability to present "blinded review" based opinion testimony; Plaintiffs' own actions and decisions did. Unhappy as they may be with those decisions, they must live with them. Because of this, without conceding the arguments herein, should this Court find error or abuse of discretion in the trial court's ruling relative to Dr. Landolfi, any such error or abuse should be deemed harmless and the trial court's ruling should be upheld.

Furthermore, the trial courts' decision to charge the jury with a "hindsight" instruction was not an abuse of discretion and was necessary and appropriate under the circumstances to properly instruct the jury as to the standard of care applicable to Dr. Vandermeer following repeated and deliberate attempts by Plaintiffs to

12

improperly frame the standard of care as a "hindsight" standard of care. Finally, the "hindsight" instruction given by the trial court was a correct statement of the law. As such, the trial court's decision to give the "hindsight" instruction and the language of the instruction should be upheld.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

Appellees are "dissatisfied" with Appellants' "statement of the standard of review" and assert that it is incomplete.  Fed. R. of App. Proc. 28(b).

A court's ruling on the Act's § 3-2A-02 "related field" qualification prerequisite is a question of fact.  See Pandezides v. Virginia Bd. of Educ., 13 F.3d 823, 833 (4th Cir. 1994) (though in the context of an employment issue, holding that a question of "qualification" is a question of fact).  A question of fact "will only be overturned on appeal if it is clearly erroneous."  United States v. Vinson, 886 F.2d 740, 742 (4th Cir. 1989).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Educ. Credit Mgmt. Corp. v. Frushour, 433 F.3d 393, 404-05 (4th Cir. 2005) (citing Anderson v. Bessemer City, 470 U.S. 504, 573 (1985)).

A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion.  GE v. Joiner, 522 U.S. 136, 138 (1997); Cooper v. Smith &

Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001). Taken together, the words abuse of discretion "convey an unmistakable message: that as a matter of priority as well as sequence, discretion is first, and review for abuse is only a posterior check on judgment which strays too far from the mark." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). "At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." Id.

Discretion can by abused by a trial court if it fails or refuses "to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule or discretion"; "by failure, in attempting to exercise discretion, adequately to take into account judicially recognized factors constraining its exercise"; or "by an exercise that is flawed by erroneous factual or legal premises." James v. Jacobson, 6 F.3d 233, 239 (4th Cir. 1993). Other terms that have been employed by this Court to explain abuse of discretion include "erroneous view of the law," "patently arbitrary application of the controlling law," "clearly erroneous assessment of the evidence," "judgment call outside the range of choices permitted," and "error in the weighing process by which discretion is exercised." Evans, 514 F.3d at 322.

A "district court's decision to give or refuse to give a jury instruction" is reviewed for abuse of discretion. United States v. Passaro, 577 F.3d 207, 221 (4th

14

Cir. 2009). "[I]t is well settled that a trial court has broad discretion in framing its instructions to a jury." Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 484, (4th Cir. 2007) (citing Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 526 n.11 (4th Cir. 2003)). The question of whether the instruction given accurately states the law is reviewed *de novo*. Id. (citing United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003)).

## II.   THE TRIAL COURT'S DECISION TO PRECLUDE JOSEPH LANDOLFI, M.D. FROM OFFERING STANDARD OF CARE TESTIMONY WAS CONSISTENT WITH STATE AND FEDERAL LAW AND THEREFORE, NEITHER CLEARLY ERRONEOUS NOR AN ABUSE OF DISCRETION.

Prior to permitting an expert witness to testify, a federal court sitting in diversity jurisdiction must first determine under the Act whether the expert witness satisfies the § 3-2A-02(c) "qualification prerequisite" before conducting an F.R.E. 702 analysis to determine admissibility of an expert witness's proposed testimony. Therefore, the trial court was correct in its application of the Act's "qualification prerequisite" to Dr. Landolfi prior to ruling on the admissibility of his testimony. As demonstrated below, the trial court's rulings on the issues of Dr. Landolfi's qualifications and the admissibility of his testimony, resulting in his preclusion from offering standard of care testimony, were not clearly erroneous or an abuse of discretion, respectively, and therefore, should be upheld.

## A. Application of the Act and Rule 702 to the instant case.

"The provisions of the Health Care Malpractice Claims Act [ ], Md. Code Ann. Cts. & Jud. Proc. Art. § 3-2A-01, *et seq.* (2010), are binding in diversity matters in federal court." Jones v. Bagalkotakar, 750 F.Supp. 2d 574, 577 (D. Md. 2010). The Jones court's ruling is instructive, particularly in light of its reliance on Davison v. Sinai Hospital of Baltimore, Inc., 462 F.Supp. 788 (D. Md. 1978), *affirmed* 617 F.2d 361 (4th Cir. 1980) and Rowland v. Patterson, 882 F.2d 97 (4th Cir. 1989). In Davison, a decision later affirmed by this Court, the trial judge concluded that §§ 3-2A-01 and 3-2A-02 were applicable to federal courts exercising diversity jurisdiction. Davison, 462 F.Supp. at 779 ("The court does not believe that Sections 3-2A01 and 3-2A02 of this subtitle were intended to except federal courts exercising diversity jurisdiction from the provisions of the act."). The Davison court explained that the Act constitutes substantive rather than procedural law and therefore, pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), the Act and the provisions therein must be applied by a federal court sitting in diversity jurisdiction. Davison, 462 F.Supp. at 779-80.

The first issue before this Court is the trial court's ruling regarding Dr. Landolfi's qualifications which is a threshold issue governed by Section 3-2A-02 (c)(2). Making clear that all actions brought under the Act are governed by all

16

provisions of the Act, obviously inclusive of 3-2A-02(c), Section 3-2A-02(a)(1)

provides:

> All claims, suits, and actions, including cross claims, third-party claims, and actions under Subtitle 9 of this title, by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought are subject to and shall be governed by the provisions of this subtitle.

Id.  Of particular consequence to the resolution of the appeal at bar, Section

3-2A-02(c)(2)(ii)(1) provides:

> In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care: (A) Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action.

Id.

Section 3-2A-02 is not an evidentiary rule of admissibility but a threshold

substantive law question that must be satisfied prior to the determination by a trial

court of whether the expert is qualified to offer expert testimony pursuant to F.R.E.

702.  If, and only if, this threshold requirement is satisfied, does a trial court then

apply F.R.E. 702 to determine whether the expert's opinions are admissible.[7] Indeed, Maryland courts have made this point clear. In <u>Demuth v. Strong</u>, 45 A.3d 898 (Md. Ct. Spec. App. 2012), the Maryland Court of Special Appeals held that § 3-2A-02(c)(2) was a "qualification prerequisite" which if not satisfied, prevented the expert from testifying at trial. If the § 3-2A-02(c)(2) "qualification prerequisites" are satisfied, the court **then** determines the admissibility of the expert's testimony pursuant to the Maryland Rules of Evidence. <u>Id.</u> at 909.

Central to the trial court's determination of Dr. Landolfi's qualifications and therefore, this Court's analysis, is the term "related field." In <u>Demuth</u>, the Maryland Court of Special Appeals clarified the meaning of "related field." 45 A.3d 898 (Md. Ct. Spec. App. 2012); <u>see</u> <u>also</u> <u>Nance v. Gordon</u>, 62 A.3d 185 (Md. Ct. Spec. App. 2013). In <u>Jones v. Bagalkotakar</u>, 750 F.Supp. 2d 574, 577 (D. Md. 2010), the United States District Court for the District of Maryland also explained the term "related field." Collectively, these cases stand for the proposition that the expert's field of practice and the defendant health care provider's field of practice must "overlap" and that if the expert performs the "procedure" in question with a "meaningfully different standard of care" than does the defendant health care provider, the expert

---

[7] Appellants suggest this Court must choose whether to apply the Act or F.R.E. 702. That suggestion is incorrect; both are to be applied with analysis under the Act being undertaken first.

18

does not qualify under the Act and cannot offer standard of care testimony. <u>Jones</u>, 750 F.Supp. 2d at 581; <u>see</u> <u>also</u> <u>Nance</u>, 62 A.3d 185; <u>Demuth</u>, 45 A.3d 898.

Once the Act has been applied, and only if the expert has satisfied the "qualification prerequisite, F.R.E. 702 is then applied to determine the admissibility of the expert's opinion. It is well established that a trial judge has "broad discretion in determining whether to admit expert testimony and should not be reversed absent a clear abuse of discretion." <u>Thomas J. Kline, Inc. v. Lorillard, Inc.</u>, 878 F.2d 791, 799 (4th Cir. 1989) (<u>citing</u> <u>Friendship Heights Assoc. v. Vlastimil Koubek</u>, 785 F.2d 1154, 1159 (4th Cir. 1986)); <u>see</u> <u>also</u> <u>Oglesby v. Gen. Motors Corp.</u>, 190 F.3d 244, 250 (4th Cir. 1999) (district courts enjoy "broad latitude" in determining the admissibility of expert testimony). "Helpfulness" to the jury in understanding the evidence or to determine a fact in issue is "the touchstone of Rule 702." <u>Friendship Heights Assoc.</u>, 785 F.2d at 1159 (<u>citing</u> <u>Breidor v. Sears, Roebuck and Co.</u>, 772 F.2d 1134, 1139 (3rd Cir. 1983)). It therefore stands that unhelpful testimony should not be admitted. <u>See</u> <u>generally</u>, <u>id.</u>

**B. The trial court correctly applied the Act and its ruling that Dr. Landolfi failed to satisfy the "qualification prerequisite" set forth in § 3-2A-02(c)(2) was not clearly erroneous.**

Plaintiffs designated three experts to offer standard of care opinions: Dr. Latchaw, Dr. Landolfi and Dr. Bloomfield. Dr. Latchaw, a board-certified neuroradiologist, clearly satisfied the Act's "qualification prerequisite." Dr.

Landolfi, a board-certified neurologist, and Dr. Bloomfield, a board-certified neurosurgeon, were the subjects of objections to preclude them from offering standard of care opinions. With regard to Dr. Landolfi, Defendants argued that his practice did not sufficiently overlap with Dr. Vandermeer's to satisfy the § 3-2A-02(c)(2) "qualification prerequisite" and that the foundation for his proffered standard of care opinion was inadequate under F.R.E. 702. With regard to Dr. Bloomfield, Defendants argued that his practice was not sufficiently overlapping with Dr. Vandermeer's to satisfy the § 3-2A-02(c)(2) "qualification prerequisite." The trial court sustained the defense objection as to Dr. Landolfi based on § 3-2A-02 and Nance v. Gordon, 62 A.3d 185, DeMuth v. Strong, 45 A.3d 898 and Jones v. Bagalkotakar, 750 F. Supp. 2d 574, and F.R.E. 702. Section 3-2A-02 and F.R.E. 702 served as independent grounds upon which the trial court excluded his standard of care testimony. The trial court overruled the objection as to Dr. Bloomfield.

**1. Dr. Landolfi's qualifications**

**i. Final decision making**

When reviewing the trial court's ruling regarding Dr. Landolfi for clear error and abuse of discretion, it is important that this Court keep in mind his trial testimony, that "**although I read my own scans, I count on the radiologist's final report to make the final decision**." [147]. Dr. Landolfi is not and has not been in a professional position similar to that of radiologists who are on the "front lines" of

diagnostic and treatment decision making and who are counted on by other physicians, including Dr. Landolfi, to reach a final interpretive decision about an imaging study and generate a formal report used for treatment. There is a fundamental difference between the duty and responsibility of a radiologist who must make interpretive "final decisions" that will direct patient care and Dr. Landolfi, a neuro-oncologist, who does not make interpretive "final decisions," and cannot and does not generate any type of report, formal or informal. Because of his reliance on radiologists, Dr. Landolfi does not have an overlapping practice and reviews MRIs pursuant to a "meaningfully different standard of care" than a radiologist. As such, setting aside for the moment anything else Dr. Landolfi said, with this statement alone, the trial court had before it crystal clear evidence that Dr. Landolfi's practice with regard to MRI interpretation does not overlap with Dr. Vandermeer's such that he could have satisfied the section 3-2A-02(c) "qualification prerequisite," and further, that his "interpretation" of MRIs occurs under a meaningfully different standard of care than that to which Dr. Vandermeer is held.

### ii.    Dr. Landolfi's other qualifications and foundation

Turning to his other qualifications as they relate to the § 3-2A-02(c) "qualification prerequisite," Dr. Landolfi testified at trial that he did not pursue training in radiology through a residency or fellowship [163]; that he was not formally trained to work for a business like Advanced Radiology [165]; that he is

not board-certified in general, diagnostic or neuroradiology [166]; and that he is not board-eligible in radiology [169].

He testified that he has "never been credentialed, allowed to read a radiology study in a hospital, and generate a formal report" [164]; that he has never applied to obtain credentialing to read an MRI for the purpose of generating a formal report [Id.]; and that he would not be permitted by state law of New Jersey, where he practices, to generate a formal radiology report due to lack of credentialing. Id.

Regarding employment, he testified that he does not hold himself out to the community or to his colleagues as an expert in the field of radiology [173]; that he had never been employed by a radiology practice that provided radiology services to a hospital or for a "freestanding radiology clinic" [165]; that he was not licensed to work for a business like Advanced Radiology [id.]; and that he does not belong to any professional radiology organizations.  [169].

Regarding teaching responsibilities, he testified that he does not train radiology residents [170], though he does teach neurology residents to read MRI's of the brain.  [176].  He also testified that he has never published any literature on radiology [171] and that the television appearances referenced in Appellants' brief (Appellant's br., p. 22) had nothing to do with interpreting imaging studies.  [172].

Regarding his foundation for offering an opinion about which radiologists (and Dr. Vandermeer) are held, Dr. Landolfi testified as follows:

22

> Q: Let's stay on my question to you. My question to you, can we agree it's your opinion as far as foundation for how you render opinions about a radiologist, **your foundation is if you can see the tumor or see something that's abnormal that the radiologist does not identify as abnormal, every time that radiologist has violated the standard of care, period?**
> A: **Yes.**  [174] [emphasis added].

To be clear, the foundation for Dr. Landolfi's standard of care opinion as well as his understanding of the relevant standard of care was "if Charles Landolfi, M.D. sees something a radiologist does not, the standard of care was violated." Considering this, the trial court correctly concluded that the foundation for Dr. Landolfi's proffered standard of care opinion was inadequate.

## 2. Dr. Bloomfield's qualifications compared to Dr. Landolfi's

Dr. Bloomfield is a board-certified neurosurgeon. Dr. Bloomfield's qualifications, based on his testimony, far exceed those of Dr. Landolfi as they relate to the ability to offer standard of care opinions against a radiologist. At trial, Dr. Bloomfield testified that he received specific training in the reading of brain MRIs "[o]n a daily basis" during residency and fellowship and completed a six month residency training exclusively in reading brain MRIs alongside radiology residents in addition to constant training by a radiologist "in the art and science of interpreting MRI scans. . ." [236-37]. Dr. Landolfi underwent no such training. He further testified that he interprets "imaging studies and make[s] reports and send[s] them out to my colleagues and to the referring doctors" and that his reports are included

23

in patients' charts on a daily basis. [259-60]. No such reports are generated by Dr. Landolfi. Unlike Dr. Landolfi, Dr. Bloomfield uses neuroimaging as a guide when performing open surgery on a patient's brain. [242-43].

With regard to teaching, Dr. Bloomfield testified that when he was employed by West Virginia University, he was "involved with teaching the [ ] neuroradiology fellows as well as the regular radiology residents." [262]. Dr. Landolfi has never taught neuroradiology or regular radiology students. Dr. Bloomfield continues to give lectures at the New Jersey Medical School to radiology and neuroradiology residents and to radiology residents at Robert Wood Johnson Medical Center. [262]. Dr. Landolfi does not.

**3. The trial court's determination to preclude Dr. Landolfi from offering standard of care testimony was well-reasoned, based on the facts before it and not clearly erroneous or an abuse of discretion.**

That the trial court's ruling was not clear error is demonstrated not only by a review of the evidence upon which it rested its ruling, but on the contrasting qualifications between Dr. Landolfi and Dr. Bloomfield and the fact that the court reached a different conclusion as to Dr. Bloomfield.

**i.  The trial court's analysis under the Act as to Dr. Landolfi.**

In ruling on Defendants' objection to Plaintiffs' proffer regarding Dr. Landolfi, the trial court correctly first considered the Act. To interpret the term "related field" as used in §3-2A-02, the trial court correctly relied on <u>Nance</u>, 62 A.3d

185, DeMuth, 45 A.3d 898 and Jones, 750 F. Supp. 2d 574. [183-184]. Reviewing these opinions in conjunction with the testimony offered by Dr. Landolfi, the trial court ruled that Dr. Landolfi did not satisfy the "related field" "qualification prerequisite" because his practice did not overlap with Dr. Vandermeer's. The court arrived at this conclusion based on Dr. Landolfi's lack of qualification and education in radiology and inability to generate radiology reports like the one Dr. Vandermeer generated on January 11, 2008. Based on its conclusion that Dr. Landolfi's area of practice was "not so overlapping in terms of his experience for him to opine as to a standard of care" [199], the court ruled that he could not offer standard of care testimony. [179-200]. The trial court reiterated its ruling, explaining its basis rested on the evidence presented:

> [B]ased upon the testimony that has been presented here in this courtroom thus far, including the voir dire of this witness in the presence of the jury, in terms of what his opinion is, okay, he is not permitted to – he is not qualified to provide expert testimony as to the standard of care of Dr. Vandermeer. [200].

The conclusions that can reasonably be drawn from Dr. Landolfi's testimony, and that the trial court did draw – most notably that his practice does not overlap with Dr. Vandermeer's and that his review of MRIs is governed by a meaningfully different standard of care – demonstrate the above ruling was not clearly erroneous. The Act would be rendered meaningless if providers who merely relied on a particular field due to their own lack of expertise were later able to serve as an expert,

25

explaining to a jury the standard of care to which the relied upon field was held. The process described by Dr. Landolfi, his review of an MRI, but reliance on a radiologist to make the "final decision," is the same process that plays out in a residency: residents review a particular issue but rely on the professor to "make the final decision." A resident would not be qualified to render standard of care opinions against Dr. Vandermeer; neither is Dr. Landolfi.

The lack of other qualifications also serves as a basis upon which to uphold the trial court's ruling. Even if Dr. Landolfi were permitted to generate formal reports, unlike Dr. Bloomfield, he does not generate any, even informally. He also did not obtain any training like Dr. Bloomfield in neuroradiology and has never taught radiology students. The above demonstrates a lack of experience in the field of practice of radiology. These factors were sufficient grounds to lead to a factual ruling by the trial court that Dr. Landolfi's practice did not sufficiently overlap with Dr. Vandermeer's practice. On these grounds as well, the trial court's ruling should be upheld.

The trial court reiterated its finding later in the trial, explaining the distinction between Dr. Landolfi and Dr. Bloomfield:

> I drew a distinction between Dr. Landolfi and Dr. Bloomfield, the neurosurgeon, and over defense objection. . .I found that there was a difference between a neurosurgeon and the overlapping disciplines there than there was for a neuro-oncologist. And just so the record is clear on this, I dealt with the issue under the [the

Act], Section 3-2A02, and an opinion by Judge Williams of this Court in <u>Jones versus Bagalkotakar</u>, [] 50 F. Supp. [Second] 574. . .And then I noted the case as well [of] the Court of Special Appeals of Maryland, <u>Demuth versus Strong</u> at 45 Atlantic 2d., 898, Maryland Appellate, holding that a vascular surgeon was qualified to opine as to breach of standard of care in a certain area.   And I found there was sufficient overlap between neurosurgery and a neuroradiologist, that neurosurgeons would be [] qualified to provide their opinion with respect to reading of an MRI.  But that did not apply to Dr. Landolfi. . . [433-34].

This distinction, the Court's reliance on the evidence and its application of the correct law, is a demonstration of the fact that the trial court engaged in a thorough, reasoned decision making process to arrive at its factual conclusion regarding Dr. Landolfi's qualifications.  As such, this Court should not find that conclusion clearly erroneous.

###     ii.    The trial court's analysis under the Act as to Dr. Bloomfield.

With regard to Dr. Bloomfield, the trial court engaged in analysis under the same law, but reached a different factual conclusion based on Dr. Bloomfield's qualifications: Dr. Bloomfield's practice of neurosurgery sufficiently overlapped with Dr. Vandermeer's practice to permit him to offer standard of care opinions.  In finding a sufficient overlap, the trial court noted that Dr. Bloomfield and Dr. Vandermeer were qualified to interpret MRIs of the brain by their training and practice, that Dr. Bloomfield had clinical experience in the field of health care in which Dr. Vandermeer provided care and treatment to Mr. Szyjka, and therefore,

"with respect to a brain surgeon, that that necessarily overlaps in those fields, as I've said, within the ambit of those three cases." [271-72]. In so clearly drawing a distinction between Dr. Bloomfield and Dr. Landolfi based on application of the correct law, the trial court demonstrated that it did not act arbitrarily, took into account "judicially recognized factors constraining its exercise" and rendered its decision on sound factual premise.

Defendants submit that in light of the entire body of evidence regarding the respective qualifications of Drs. Landolfi and Bloomfield, this Court should not be left with a "definite and firm conviction that a mistake has been committed" and should therefore uphold the trial court's ruling pursuant to the Act as it relates to Dr. Landolfi.

### iii.    The trial court's analysis as to Dr. Landolfi under Federal Rule of Evidence 702.

In addition to Defendants objection, pursuant to the Act, they also objected pursuant to F.R.E. 702 to Plaintiffs' proffer of Dr. Landolfi as an expert on the standard of care to which Dr. Vandermeer was held on the basis that his opinion lacked the necessary foundation. [181-82]. This is unmistakably an F.R.E. 702 foundational issue, evidenced by the trial court's acknowledgment that Dr. Landolfi's statement as to the appropriate standard of care "goes to the foundation of the opinion he provides." [191]. Summing up this issue, the trial court ruled that for Dr. Landolfi "to say if he sees a tumor and a radiologist does not, then that

violates a standard of care, is not an adequate predicate for him to provide an expert opinion. Plain and simple." [199]. Therefore, even if the trial court had ruled that Dr. Landolfi satisfied the "related field" "qualification prerequisite," the preclusion of Dr. Landolfi from offering standard of care opinions was well-founded and thus the trial court did not abuse its discretion in ruling that Dr. Landolfi lacked the necessary foundation for his standard of care opinion under F.R.E. 702. On this ground alone, the Court should uphold the trial court's preclusion of Dr. Landolfi's proposed standard of care testimony.

Dr. Landolfi's testimony that a radiologist violates the standard of care if he sees a particular finding and the radiologist does not was unhelpful to the jury as it was an incorrect statement of the standard of care to which a radiologist is held. Radiologists are held to a national standard of care and not a "Landolfi standard of care." Zeller v. Greater Baltimore Medical Center, 506 A.2d 646, 652 (Md. Ct. Spec. App. 1986) (citing Shilkret v. The Annapolis Emergency Hosp. Assoc., 349 A. 2d 245 (Md. 1975)). Were Dr. Landolfi's unfounded and incorrect standard of care opinion permitted to reach the jury, the jury would have engaged in deliberations taking into consideration an incorrect statement of the standard of care. Therefore, Dr. Landolfi's testimony would not "help the trier of fact" to "determine a fact in issue." Fed. R. Evid. 702. Moreover, his incorrect statement of the standard of care – "if I can see it, so should he" – was based on insufficient facts and data and was

not the product of any reliable principle. Therefore, his standard of care opinion could not have been reliably applied to the facts of the case. See Fed. R. Evid. 702.

The lack of foundation for his standard of care opinion is all the more apparent when viewed in contrast to Dr. Latchaw's testimony which highlighted Dr. Landolfi's "if I can see it, so should he" standard. According to Dr. Latchaw, an expert familiar with the actual standard of care to which Dr. Vandermeer was held, the standard of care does not require a radiologist to identify every abnormality on an imaging study. [112]. Dr. Landolfi's proposed standard would hold radiologists to an arbitrary standard of perfection.

Based on all of the above, the trial court did not abuse its discretion in ruling pursuant to F.R.E. 702 to preclude Dr. Landolfi from offering a radiology standard of care opinion.

## C. The exclusion of Dr. Landolfi's standard of care opinion did not prejudice Plaintiffs by costing them a fair trial.

Without conceding the above, because Plaintiffs, like Defendants, were permitted to call two standard of care experts, did not intend to utilize a blinded review process (even with a second chance) and because practically speaking, Dr. Landolfi offered a standard of care opinion based on his non-blinded review process, any assignment of error by this Court to the decision making of the trial court should be deemed harmless error, and the jury's verdict in favor of Dr. Vandermeer should stand.

## 1. Standard

Federal Rule of Evidence 103, which addresses the concept of harmless error, provides in relevant part that "a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party. . ." Fed. R. Evid. 103. The United States Code addresses harmless error in 28 U.S.C. § 2111 (Harmless Error), which provides:

> On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

Id.

## 2. Without conceding that the trial court made reversible error, even if it did, any error was harmless.

The crux of Plaintiffs' prejudice argument rests on the assertion that because Dr. Landolfi was the only expert they designated who reviewed the at-issue imaging study in a "blinded" fashion, they were prejudiced by the inability to call him. What Plaintiffs have not told the Court is that due to the death of their first neuroradiology expert, Dr. Levy, they were granted leave by the trial court to designate a second neuroradiology expert (Dr. Latchaw) after the depositions of all defense standard of care experts. With the benefit of having deposed all of the standard of care experts Defendants intended to call at trial and fully aware, therefore, of Defendants' blinded review process and defense, Plaintiffs nevertheless chose not to engage Dr. Latchaw

in a blinded review process. If a counter-argument to Defendants' blinded review process had really been an important aspect of their case, Plaintiffs would have taken the opportunity to engage Dr. Latchaw, their second neuroradiology expert, in a blinded review process. They did not.

Nevertheless, the Szyjkas assert that they were denied a fair trial because they lost the opportunity to present evidence of Dr. Landolfi's "blinded review" process.[8] They argue they were prejudiced because the two experts they called at trial were insufficient to counter Defendants' defense of the case. If Plaintiffs wanted better witnesses, they should have retained better witnesses. If they wanted experts who engaged in the same process as Defendants' experts, they should have retained

---

[8] In actuality, Dr. Landolfi's review of the at-issue image was not a blinded review. No radiologist starts a review with a single image on a computer screen, pulled up by another physician who asks for the radiologist's thoughts about the lone image on the screen. Radiologists are not afforded the benefit of image prescreening, which Dr. Bloomfield did for Dr. Landolfi. In actuality, radiologists engage in the review of numerous imaging studies, many of which contain hundreds of images, without any indication of which, if any image, may have a noteworthy finding. Nevertheless, and though not part of their litigation strategy, Plaintiffs claim they were stripped by the trial court's ruling of what they frame as the most important part of their case – Dr. Landolfi's review, which occurred in a dramatically different manner than the reviews performed by Defendants' experts and by Dr. Vandermeer. Trial testimony revealed that Dr. Landolfi walked into Dr. Bloomfield's office where he immediately saw the image in question on Dr. Bloomfield's computer screen. [210-11]. Dr. Bloomfield then asked Dr. Landolfi to look at the image and tell him "what I think." Id. At that point, Dr. Landolfi surely knew there was, at the very least, an area of concern in the image because otherwise, Dr. Bloomfield would not have asked him to look at the image. Unlike the blinded process engaged in by Defendants' experts, Dr. Landolfi was specifically directed to the exact image that contained the finding Plaintiffs alleged Dr. Vandermeer improperly did not report.

experts to engage in the same process. Even with the second chance afforded them with Dr. Latchaw, they did not. This Court should assign no weight to Plaintiffs' complaints about the inadequacies of their experts or those experts' review process as Plaintiffs, and Plaintiffs alone, were the only party who could have avoided the issue about which they now complain. The decision to engage their experts in a blinded review was in their hands, but they ignored the opportunity to engage in this process and should be held to the consequences of their decision.

Moreover, the trial court permitted Dr. Landolfi to testify to the method by which he reviewed the MRI in question and that the finding was "obvious," thereby effectively permitting him to offer a standard of care opinion. The trial court stated: "You're certainly free to say that Dr. Landolfi walked in, he said I saw it right away, and you're certainly free to elicit that testimony and get in his area of expertise." [202]. Indeed, Dr. Landolfi testified that he walked into a room in which Dr. Bloomfield had the MRI image in question on his computer and that it was immediately "obvious" and "clear" that an abnormality was present. [210-11]. If a determination of error is made, the Court should determine such error was harmless because Plaintiffs' own actions demonstrate the blinded review process was unimportant to them and in practical reality, Dr. Landolfi gave a standard of care opinion to the jury.

Finally, Plaintiffs and Defendants called the same number of experts to testify as to the standard of care to which Dr. Vandermeer was held – two. This fact alone should result in a finding by this Court of harmless error in the event it determines the trial court erred in its decision to preclude Dr. Landolfi from offering standard of care testimony. The Court is not confronted with a situation where Plaintiffs were forced to elicit standard of care opinions from an unprepared expert or from an expert with whose opinions they were unfamiliar. To the contrary, both of Plaintiffs' trial standard of care experts were designated months prior to trial, both were deposed on, among other topics, their standard of care opinions, and only days before trial at the motions *in limine* hearing, Plaintiffs steadfastly maintained Dr. Bloomfield's qualification as a standard of care witness. See Pls.' Opposition to Motion *in Limine* to Preclude Drs. Bloomfield and Landolfi from Offering Standard of Care Testimony at [The] Trial of this Case. Docket Entry 58. Through repeated assertions from the time of their expert designation until the start of trial, Plaintiffs made clear their belief that Dr. Bloomfield was as qualified to render standard of care opinions as any of Defendants' experts. Now, in an odd twist, Plaintiffs argue that though qualified, Dr. Bloomfield was not qualified "enough" because of the method by which they secured his opinions. Plaintiffs' apparent unhappiness with a tactical decision they made regarding their expert review process should not be imputed to Defendants. As Plaintiffs and Defendants were both permitted to call two standard of care

34

experts, any error this Court finds in the trial court's ruling should be deemed harmless error.

## III. THE HINDSIGHT INSTRUCTION GIVEN BY THE TRIAL COURT WAS WARRANTED UNDER THE CIRCUMSTANCES AND WAS A CORRECT STATEMENT OF MARYLAND LAW.

### A. Standard

A "district court's decision to give or refuse to give a jury instruction" is reviewed for abuse of discretion.  Passaro, 577 F.3d 207, 221 (4th Cir. 2009).  The question of whether the instruction given accurately states the law is reviewed *de novo*.  Volvo Trademark Holding Aktiebolaget, 510 F.3d at 484 (citing Cherry, 330 F.3d at 665).  A party "has the right to have his theory of the case presented to the jury" by way of jury instruction.  Kennelly v. Burgess, 654 A.2d 1335, 1341 (Md. 1995) (citing Aleshire v. State, 170 A.2d 758, 765 (Md. 1961)).  Though use of pattern jury instructions is generally favored by Maryland Courts (Perez v. State, 29 A.3d 656, 659-62 (Md. Ct. Spec. App. 2011)), and can "serve as a useful and important road map for trial judges" (Green v. State, 705 A.2d 133, 140 (Md. Ct. Spec. App. 1998)), Maryland Courts recognize the importance of non-pattern jury instructions.  Speaking generally, the Green Court explained:

> [T]he pattern instructions are not comparable to rules of evidence. They serve as a valuable resource tool, but they do not necessarily fit every conceivable situation. Therefore, they cannot be followed without consideration of the particular circumstances of each case.

Green, 705 A.2d at 140.  Turning to the instructions before it, the Green court
continued:

> Here, although the pattern instruction was correct, it was not
> adequate, because it did not encompass the valid defense asserted
> by appellant. **When the evidence generates an issue that is not
> covered by a pattern instruction, we must count on the court
> to incorporate relevant and valid legal principles gleaned
> from the case law.**

Id. [emphasis added].  The Green court not only reiterated the acceptance of non-
pattern jury instructions in Maryland, but went a step further, explaining that
Maryland appellate courts expect trial courts to utilize non-pattern instructions,
crafted from "valid legal principles gleaned from the case law," when necessary or
helpful under the circumstances of a particular case.  Indeed, the Maryland Court of
Appeals, recognizing the importance of non-pattern jury instructions has gone so far
as to hold that a trial court abused its discretion by failing to give a non-pattern jury
instruction.  Arthur v. State, 24 A.3d 667, 677 (Md. 2011).

Case law, however, is not the only prominent source of approval of non-
pattern instructions in Maryland.  In his Preface to the Maryland Pattern Jury
Instructions, Fourth Edition, then Chief Judge of the Maryland Court of Appeals
Robert M. Bell, quoting former Chief Judge Robert C. Murphy's explanation of the
utility of the Maryland Pattern Jury Instructions, noted the limitations of the pattern

instructions, expressing the need, where necessary or helpful, for non-pattern instructions:

> Of course, pattern jury instructions may never mindlessly be adopted as befitting all cases. They are not intended by the authors as containing the final authoritative word on every legal proposition which they espouse. Nor are they intended to be of applicability without regard to the fact situation to which they generally may be related. As always, it remains the obligation of the lawyer in proposing jury instructions for adaptation by the court to independently assess the applicable and controlling legal principles.

Maryland Civil Pattern Jury Instructions, Fourth Ed. Preface (2003).[9] The General Explanatory Notes on Use from the same edition explain: "These instructions are not mandatory on the Court. They are offered as guides both as to form and substance. A resourceful Bar will not allow pattern instructions to replace ingenuity or discourage independent research." Id., General Explanatory Notes on Use. With this statement, similar to the caution sounded against blind adherence to pattern instructions by Chief Judge Bell, and Chief Judge Murphy before him, the Committee which drafts and edits the very instructions at issue, noted the limitations of the pattern instructions and expressed the need, at times, for non-pattern instructions.

---

[9] The Fourth Edition is the current edition in Maryland.

## B. The "hindsight" instruction, as given by the trial court, was an accurate statement of Maryland law.

The "hindsight" instruction with which the Szyjkas take issue, derived from

Maryland Civil Pattern Jury Instruction, 27:1, follows:

> A health care provider is negligent if he does not use that degree of care and skill which a reasonably competent healthcare provider engaged in a similar practice and acting in similar circumstances would use.
>
> A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively.
>
> If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the doctor is not liable for malpractice. [563].

The jury was charged with this instruction as a result of Defendants' request for a

modified instruction regarding hindsight due to their concern that Plaintiffs had

repeatedly improperly framed the standard of care.[10]  Specifically, the Szyjkas assert

that giving the last two paragraphs of the above "hindsight" instruction was

reversible error.  As demonstrated below through a review of Maryland, Fourth

---

[10] Plaintiffs also proposed a modified, non-pattern jury instruction, rendering their indictment of non-pattern jury instructions curious.  Transcript of Trial Day Nine, April 10, 2014, pp. 101-08.  By their own actions, Plaintiffs clearly believe that non-pattern jury instructions are appropriate and as such, their argument that "[t]he appellate courts of Maryland have cautioned trial courts against deviating from the pattern instructions. . ." must be taken with a grain of salt.  Appellants br., p. 34.

Circuit and Federal District of Maryland case law, the instruction before this Court is an accurate statement of Maryland law which was given by the trial court to prevent confusion by the jury regarding the standard of care to which Dr. Vandermeer was held.

The language used by the trial court in the "hindsight" instruction was taken directly, and repeated verbatim, from the United States District Court for the District of Maryland's opinion in East v. United States, 745 F. Supp. 1142 (D. Md. 1990).[11] In East, the court explained:

> A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively. If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in **perfect hindsight**, then the doctor is not liable for malpractice.

East, 745 F. Supp. at 1149 [internal citations omitted] [emphasis added] (citing Macguineas v. United States, 738 F. Supp. 566, 570-71 (D.D.C. 1990)). The Macguineas court, applying Maryland law, addressed the "hindsight" issue and explained, using language nearly identical to the instruction before this Court:

---

[11] The Szyjkas cite to Kennelly v. Burgess for the proposition that "not all language from appellate opinions should be used to formulate jury instructions as doing so may not adequately inform jurors of their responsibility." Appellants' br., p. 35 (citing Kennelly, 654 A.2d 1335, 1340 (Md. 1995)). However, Defendants submit, consistent with the Maryland Court of Appeals holding in Green, supra, that when language from case law adequately informs a jury of their responsibility, including such language in an instruction is appropriate and not an abuse of discretion.

> The Court must keep in mind **the circumstances as they existed at the time of the surgery** and the nature and complexity of the medical problems faced at that time. [Hetrick v. Weimer, 508 A.2d 522, 529 (Md. Ct. Spec. App. 1986)] (stating that if a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, **and not as we see them in perfect hindsight**, then the doctor is not guilty of malpractice).

Macguineas, 738 F. Supp. at 570-71 [emphasis added]. Hetrick, the case upon which the Macguineas court relied, is worth a closer look.

In Hetrick, the Maryland Court of Special Appeals considered, among other issues, several jury instructions including an instruction similar to that presently before this Court. Hetrick v. Weimer, 508 A.2d 522 (Md. Ct. Spec. App. 1986). The Hetrick trial court charged the jury with the following instruction:

> To hold Dr. Weimer liable, the plaintiffs have to show that his conduct was clearly not recognizable as medically acceptable. And no pediatrician is chargeable with the results of his efforts if he has applied the degree of skill ordinarily required to be expected of a pediatrician in the performance of the services required. **And you have to keep in mind the circumstances as they existed at the time of the treatment and the nature and complexity of the medical problems facing the pediatrician at that time. If you find that Dr. Weimer, under those circumstances as they then existed rather than by hindsight, exercised that reasonable degree of care and skill, then you must find in favor of the doctor.**

Hetrick, 508 A.2d at 529 [emphasis added]. On review of this instruction, the Court of Special Appeals concluded very simply, "[w]e find no reversible error in those

instructions."[12]  Id.  The Court of Special Appeals did find error in several other, unrelated instructions and reversed and remanded on the other instructions.  Appeal was taken from the partial reversal and the Maryland Court of Appeals granted certiorari.

Though not specifically at issue on appeal, the Court of Appeals, quoting the above instruction, did not disturb the Court of Special Appeals' holding as to the trial court's "hindsight" instruction.  Hetrick v. Weimer, 525 A.2d 643 (Md. 1986).  It did reverse the Court of Special Appeals as it related to its ruling on the unrelated jury instructions, resulting in all of the instructions given by the trial court being upheld.  Therefore, the "hindsight" instruction before the Court remains an accurate statement of Maryland law.

Of great significance to the question at bar is this Court's past reliance on, and approval of, the "perfect hindsight" standard which the Szyjkas claim to be a misstatement of Maryland law.  In Myles v. Laffitte, 1993 U.S. App. LEXIS 3274 (4th Cir. Feb. 16, 1993), this Court considered an issue similar to that presently before the Court.[13]  In Myles, in order to show negligent treatment by one of the

---

[12] The Szyjkas agree that the Hetrick instruction is "similar" to the "hindsight" instruction before this Court.  Appellants' br., p. 34, n.14.

[13] Consistent with United States Court of Appeals for the Fourth Circuit Local Rule 32.1(b) and Federal Rule of Appellate Procedure 32.1(b), Defendants believe this opinion "has precedential value in relation to a material issue" before this Court "and there is no published opinion that would serve as well."  Local Rule 32.1(b).  This opinion is available in a publically accessible electronic database.

defendant doctors, the plaintiff's attorney attempted to introduce at trial the defendant doctor's deposition testimony during which deposition the defendant "denied that he had made any error in diagnosing" the decedent. Id. at 2. "The plaintiff's lawyer asked him if, 'knowing what you know now, looking back,' he thought he made an error in diagnosis." Id. at 2-3. The defendant replied that "the baby's condition was good as was the lab work, and only upon discovery that the child had meningitis was it obvious that an error had been made." Id. at 3. The trial court did not permit the plaintiff to introduce the deposition testimony, reasoning that "a physician should be judged by what the physician knew at the time of making the diagnosis, not what he knew at a later time (the hindsight rule)."[14] Id.

In Myles, the "efforts to secure admission of [the defendant's] testimony" barred by the trial court as improper hindsight "proceeded on appeal" to this Court, though on grounds slightly different than those presently before the Court. Id. at 9-10. However, the Court specifically addressed the same "hindsight" issue now at bar, holding that "[t]he expert nature of the testimony also suffered from the fact that it would depend on evaluation with the benefit of hindsight." Id. at 10. In support of this remark, and leaving no doubt that the "perfect hindsight" instruction given

---

[14] In Myles, the trial court refused to permit a question premised on "knowing what you know now, looking back." In this case, Plaintiffs' counsel was permitted to ask "looking back" questions multiple times during trial and to argue the same to the jury. Over Defendants' objection and motion *in limine*, Plaintiffs' counsel was given significantly more leeway than was the plaintiff's attorney in Myles.

by the trial court here was an accurate statement of law, the Court specifically quoted with approval the "perfect hindsight" statement from East, which served, verbatim, as the instruction at issue. Id. (quoting East, 745 F. Supp. at 1149) ("a doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively […] If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in **perfect hindsight**, then the doctor is not liable for malpractice.")[15] [emphasis added]). In drawing its conclusion regarding hindsight, the Court also relied upon Douzart v. Jones, a Louisiana case which provided an analysis nearly identical to that from East. Id. (quoting Douzart v. Jones, 528 So.2d 602, 603 (La. App. 2d Cir. 1988) ("Neither a general practitioner or a specialist is to be held to a standard of perfection or evaluated with the benefit of hindsight."). This Court has considered, accepted and upheld as an accurate statement of Maryland law, the exact jury instruction at bar.

---

[15] Not long before the instant case, the United States District Court for the District of Maryland, like the Myles Court, placed reliance on East for the correct legal proposition that "where a doctor exercises a reasonable degree of care and skill under the circumstances as they exist, though not as seen in **perfect hindsight**, then the doctor is not liable for malpractice." Goodie v. United States, 2013 U.S. Dist. LEXIS 33854, 42-43 (D. Md. Mar. 12, 2013) [internal quotations and citations omitted] [emphasis added] (quoting East, 745 F. Supp. 1142). Like Myles, though unpublished and not an opinion of this Court, Goodie has value in relation to a material issue before this Court. This opinion is available in a publically accessible electronic database.

Maryland and Federal case law is replete with references to the "hindsight" and "perfect hindsight" standard which has been upheld (<u>Hetrick</u>, <u>supra</u>), unequivocally endorsed by this Court (<u>Myles</u>, <u>supra</u>) and repeatedly relied upon (<u>East</u>, <u>Macguineas</u>, and <u>Goodie</u>, <u>supra</u>). The statement of Maryland law in the "hindsight" jury instruction given at trial of this case was an accurate statement of Maryland law and thus, not a ground for reversal.

## C. The theory of Plaintiffs' case warranted the trial court's charge of the jury with the "hindsight" instruction.

The question of whether this instruction should have been given is reviewed for abuse of discretion. <u>Passaro</u>, 577 F.2d at 221. The circumstances of this case, notably Plaintiffs' hindsight standard of care theory, warranted the charge to the jury with the instruction at issue. The decision to do so was well-reasoned, necessary and not an abuse of discretion. Indeed, the trial court could not have been clearer regarding the basis of its decision to charge the jury with the at-issue instruction. It explained:

> And the instruction I think is accurate. It reflects not only the Maryland Pattern Instructions but a clear statement of the law, and it's a correct statement of the law. And particularly in light of the theory of the plaintiff in this case continuously asserted, it is very appropriate in this case to emphasize that it's the standard of care, and the matter of exercise of hindsight, particularly in light of your theory throughout for nine days that someone can see it, and if you can see it, then he should have seen it. That is simply not the standard of care. It's inaccurate. And my statement of the law is accurate. So for those reasons, the

> instruction stands. And the second paragraph is not only a
> correct statement of the law, it is particularly important to make
> this statement in light of efforts by the plaintiffs to make the
> standard of care contrary to what the law is in light of your
> closing arguments as well as your rebuttal argument. [553-55].

The trial court's clear concern was that the jury had been presented with an inaccurate statement of the standard of care for nine days, such that a non-pattern instruction was necessary under the circumstances to correct the inaccuracy and properly advise the jury of their responsibility.

As the trial court acknowledged, Plaintiffs worked tirelessly throughout the trial to present to the jury an incorrect statement of the standard of care. Indeed, at each phase of the trial, whether through argument or cross-examination, Plaintiffs' counsel, in what ultimately became the theme of their case, explained to the jury that if they could "eyeball it," so should have Dr. Vandermeer and repeatedly asked witnesses whether they knew "sitting here today," if the mass was "abnormal" and if that made their prospective review "wrong." See quotations, infra. The following excerpts from the trial transcript highlight these attempts by Plaintiffs, which began with their opening statement reference to the January 11, 2008 imaging study:

> That little dot right there, can't get, **you can see it**, there little –
> that little area right here is the. . .Let's put it this way, **I think
> everybody can see it**. [90] [emphasis added].
>
> * * *
>
> **You can see it**. You might not have known what it is, but **you
> can eyeball it**. [91] [emphasis added].

Plaintiffs' counsel continued to focus Plaintiffs' opening on the jury's ability to "eyeball" the tumor, stating, "He can eyeball it. You can eyeball it. And he should be able to interpret it as something unusual." [92]. Evidently to ensure the jury thoroughly understood their "eyeball-it-hindsight-standard-of-care" theory of the case, Plaintiffs' counsel continued still:

> Because you know at the end of the day, you have to yield to your own common sense. **You've got to say to yourself, shoot, I eyeballed it**. I'm not a neurosurgeon. I saw it . . . **If you can eyeball it**, and you know that a neuroradiologist should have said that it was something unusual, and if you believe that catching cancer – and this wasn't cancer, but catching a tumor early, if you think that's important, unlike some of their doctors, if you think that's important, then Dr. Vandermeer's responsible. [99-100] [emphasis added].

This is a patently improper statement of the law which can be summed up as, if you, the jury, can see an abnormality highlighted by an arrow, then Dr. Vandermeer violated the standard of care.

During cross-examination of Dr. Berkowitz, Plaintiffs' counsel pushed the issue of a hindsight review even further, directly asking whether Dr. Berkowitz thought his initial interpretation was wrong based on what he knew at the time of trial, again framing for the jury an improper "hindsight" standard of care. The following exchange occurred:

> A: . . . I concluded [the area in question] was a normal structure.
> Q: Of course, you now know you were wrong, right?

46

A: I did eventually see the study from 2009, and I do understand
that this was the beginnings of a tumor, yes.
Q: So you now know you were wrong?
A: In retrospect looking back on it, I was not correct.  [358-59].

This line of questioning continued during Plaintiffs' cross examination of Dr.

Abrahams:

Q: So in looking at that right now, you look at it and you could
say it's bone or it's vena plexus enhancing or it could be dura?
A: No.  I believe what I said is I can't be certain what it is.  But
to me, looking at the coronal image, it would be more consistent
with being bone or marrow of the bone.
Q: Okay.  And you would be wrong, wouldn't you?
[objection]
Q: And you would be wrong, wouldn't you?
A: No.  On this image, this looks like bone, and we don't know.
Later we find out there's a meningioma. . .  [373].

This line of hindsight questioning elicited an objection:

Defendants' Counsel: My objection grows out of the question of
this witness as to whether he would have been wrong.  I believe
this misstates the standard of care in Maryland to ask this doctor
in hindsight about whether his interpretation was right or wrong.
[375].

In ruling on this objection, the trial court expressed its concern regarding

Plaintiffs' counsel's line of hindsight/wrong questioning, stating: "You're certainly

free to say that it turns out this was incorrect, or that there was a meningioma, but

the question it would be wrong is an improper question."  [376].  The trial court

continued:

> "[T]o say that it would be wrong means it's wrong in terms of analysis or standard of care, which is up to the jury to determine. So that objection is well-founded and is sustained. So if you can just rephrase it in terms of how you approached it, but don't ask any witness [whether] it would be wrong because they didn't notice it at the time." Id.

The advancement of this theory continued. Plaintiffs' counsel asked Dr. Vandermeer, "but I'm looking at that one particular area that later turned out to be a tumor. I'm asking you, because some of the doctors in this case, including the defense [causation] doctors, said that shouldn't be there." [400]. Following objection, the trial court cautioned Plaintiffs' counsel for a "third time" not to blur the line between the prospective standard of care and retrospective causation elements.[16] [406]. Nevertheless, Plaintiffs' counsel again asked Dr. Vandermeer on cross-examination: "The question that I had for you is sitting here today, looking at the mass, that I have the arrow pointing to, looking at it today, is that abnormal?" [427]. And again: "Looking at this lesion where the arrow is pointing at it, looking at it today, because you haven't answered this question, it's simple, looking at it today, is that abnormal?"[17] Id. Plaintiffs' counsel further asked: "Looking at this

---

[16] The trial court indicated it would address the blurred prospective standard of care and retrospective causation perspectives by dealing with it "in terms of the instructions to the jury with respect to the issue before the jury." [405-06]. Plaintiffs did not object to the trial court's stated intent to give such an instruction.

[17] This question is similar to the impermissible question from Myles, supra, which began with, "knowing what you know now, looking back. . ."

film today, where that yellow arrow is pointed to, that mass, the film of January 11, 2008, looking at it right now, is that abnormal?" [430] and "The question is looking at it now, is it abnormal?" [431].

The hindsight questions and statements continued into closing. Plaintiffs' counsel argued, "I think we've all seen it borne out through the course of this trial, this is an abnormality that **even we can eyeball. You can see it**." [461] [emphasis added]. During rebuttal closing argument, Plaintiffs' counsel argued that "just because you're a radiologist, you can't say, well, you know, prospectively, it's something that I couldn't see and that I could easily miss." [543]. That statement to the jury is an absolutely wrong statement of Maryland law. To tell a jury that a radiologist cannot practice prospectively and should not be held to a prospective standard of care is wrong and misleading. But Plaintiffs did not stop there. The last words the jury heard from any attorney were yet another inaccurate statement of the standard of care from Plaintiffs' counsel and follow:

> **I'm asking you to take a look at it yourself. You look at it.** You may not know what it is, but **just tell me if you can eyeball it**. They made a big deal of course you can eyeball it because you know where it is. **You can see it without knowing anything about this**. As I said in opening, you might not be able to interpret it, but you can see it. **And if you can see it, so should he**. He's trained. It's his job. And I'm asking you to help me take care of them. [546] [emphasis added].

49

The manner in which Plaintiffs framed the standard of care in this case required the trial court to give the at-issue instruction to prevent jury confusion and avoid prejudice to Defendants.[18]  The only recourse to avoid confusion and prejudice, short of a mistrial, was the instruction given, which was not only an accurate statement of Maryland law, but necessary under the circumstances created by Plaintiffs to properly instruct the jury regarding the standard of care to be applied to Dr. Vandermeer.  The court's decision to give the "hindsight" instruction should be upheld.

### D. The "hindsight" instruction was not misleading, confusing or prejudicial.

The "hindsight" instruction was not confusing.  It was a concise and accurate statement of Maryland law that has been repeatedly relied upon by Maryland and Federal courts.  Also, contrary to Plaintiffs' assertion, the trial court's charge of the jury with this instruction did not prejudice Plaintiffs.  Had the trial court not explained the correct standard of care to the jury in the face of Plaintiffs' clear, repeated and deliberate attempts to convince the jury to apply an improper standard of care, Defendants surely would not have received a fair trial.  Finally, the jury was not misled because the instruction, as given, was an accurate statement of Maryland law.

---

[18] Arguably, the failure to give the at-issue instruction would have been reversible error.  See Arthur v. State, 24 A.3d 667 (Md. 2011).

## **CONCLUSION**

For all the reasons set forth herein, this Court should uphold the rulings of the trial court.

Respectfully submitted,

_____/s/ Andrew E. Vernick_____

Andrew E. Vernick
Matthew J. Chalker
Vernick & Associates, LLC
104 West Street
Annapolis, MD 21401
(443) 333-4044
avernick@vernicklegal.com
mchalker@vernicklegal.com
*Counsel for Defendants, Peter Vandermeer, M.D.*
*and Advanced Radiology, P.A*

_____/s/ John T. Sly_____

John T. Sly
Nicole McCarus Deford
Waranch & Brown, LLCLLC
1301 York Road, Suite 300
Lutherville, Maryland  21093
(410) 821-3500
jsly@waranch-brown.com
ndeford@waranch-brown.com
*Attorneys for Defendant,*
*Baltimore Washington Medical Center, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## No. 14-439

### *Paula Szyjka, et al.*

### *v.*

### *Peter Vandermeer, et al.*

### <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,957 words, excluding the parts of the brief exempted by Fed. R. App. P. 30(a)(7)(b)(iii), as verified by Microsoft Word 2013.

2.      This brief complies with the typeface requirements of Fed,. R, App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in size 14 Times New Roman style.

_____*/s/ Matthew J. Chalker*_____
Matthew J. Chalker

__January 2, 2015_____
Date

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of January, 2015, the required copies of the foregoing Appellees' Brief was filed via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

James O'C. Gentry
Emily C. Malarkey
Salsbury Clements Bekman
     Marder & Adkins, LLC
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
gentry@scbmalaw.com
malarkey@scbmalaw.com
*Counsel for Appellants*

John Sly, Esq.
Nicole Deford, Esq.
Waranch & Brown, LLC
1301 York Road, Suite 300
Lutherville, MD 21093
jsly@waranch-brown.com
nmccarus@waranch-brown.com
*Counsel for Baltimore Washington Medical Center, Inc.*


          _____*/s/ Matthew J. Chalker*_____
          Matthew J. Chalker